E. Merl Young and Lauretta W. Young v. Commissioner.
Young v. Commissioner
Docket No. 58131.
United States Tax Court
T.C. Memo 1961-33; 1961 Tax Ct. Memo LEXIS 316; 20 T.C.M. (CCH) 150; T.C.M. (RIA) 61033; February 9, 1961
*316 1. Held, upon the facts, that petitioner received salary payments in 1949 and 1950 from Commercial Insurance Agency, Inc., in the amounts determined. 2. Held, upon the facts, that petitioner received as his share of so-called commissions, which constituted ordinary income, $29,000 in 1950, and $13,500 in 1951. Held, further, that there was not a bona fide purchase by him in 1950 of an interest in an option to buy stock and a sale thereof in 1951 giving rise to long-term capital gain. Eugene Meacham, Esq., 824 Connecticut Ave., N.W., Washington, D.C., Fred R. Tansill, Esq., and Louis Hoppe, Esq., for the petitioners. Henry C. Stockell, Jr., Esq., and Lee C. Smith, Esq., for the respondent. HARRON Memorandum Findings of Fact *317 and Opinion The Commissioner determined deficiencies in income tax for the taxable years 1949, 1950, and 1951 in the amounts of $6,108.10, $2,558.84, and $204.78, respectively. Based upon alternative contentions, he has made claims for increases in the deficiencies for 1950 and 1951 under section 272(e) of the 1939 Code. The general issue is whether amounts received in 1949, 1950, and 1951 by E. Merl Young from two corporations represented ordinary income under section 22(a) of the 1939 Code, or loans. Related to and part of the general issue is the question whether there was a bona fide transaction involving the alleged purchase and sale of an option to buy stock and a resulting long-term capital gain. Findings of Fact The petitioners filed joint returns for the taxable years. During 1949 and 1950, the petitioners resided in Kenwood, Maryland, and they filed their returns for those years with the collector of internal revenue for the district of Maryland. The return for 1951 was filed with the collector of internal revenue for the district of Florida. The petitioners now are residents of Florida. E. Merl Young is referred to hereinafter as the petitioner, or Young, because *318 the issues relate to him only. In 1945, the petitioner was a loan examiner in the staff of the Reconstruction Finance Corporation (RFC). His post of duty was Washington, D.C. His employment by RFC continued until July 15, 1948, when he resigned. Thereafter, he was not employed by RFC or any other Government agency. While the petitioner was employed by RFC, his duties included examining applications for RFC loans and making recommendations with respect to them to the review board of RFC. After resigning from RFC in July 1948, Young's occupational and business activities were carried on in Washington, D.C. He maintained his family residence in Kenwood, Maryland during 1949, 1950, and part of 1951, until he sold his house in September 1951. At some time in the latter part of 1951, Young and his wife moved to Florida. At some undisclosed time, Young became acquainted with R. C. Jacobs (also known as Rex Jacobs), who was the president of the F. L. Jacobs Company. The F. L. Jacobs Company, having its main office in Detroit, Michigan, was engaged in the manufacture of automobile parts. At some undisclosed time, but prior to 1951, the F. L. Jacobs Company received a loan from RFC. *319 After resigning from RFC in June 1948, Young worked for the F. L. Jacobs Company. He also worked for the Lustron Corporation, which was engaged in the business of making prefabricated houses of metal materials and had its principal office in Columbus, Ohio. In his income tax return for 1949, Young reported the receipt of income paid by Lustron Corporation in the amount of $16,750, and of income paid by the F. L. Jacobs Company in the amount of $9,999.84. He also reported the receipt of income of $1,500 from the Charles A. Koons Company. The nature of petitioner's services to all of these corporations is not disclosed. Although there was an interval beginning in December 1949 and continuing until about the end of June 1950 when Young was not on the payroll of the F. L. Jacobs Company, Young maintained his contacts with that company and with R. C. Jacobs. Thus, in his returns for 1950 and 1951, he reported the receipt of income from the F. L. Jacobs Company in the respective amounts of $6,000 and $15,000. In the fall of 1949, R. C. Jacobs introduced Young to Joseph Rosenbaum, a partner in a law firm located in Washington, D.C., which was then known as the firm of Goodwin, Rosenbaum, *320 Meacham & Bailen, and later was known as Goodwin, Rosenbaum, Meacham & White. For convenience, the law firm is referred to hereinafter as the Rosenbaum law firm. A close relationship developed between Joseph Rosenbaum and Young. Joseph's brother, Francis N. Rosenbaum, hereinafter called Frank, is a partner in the same law firm. At some time in 1950 Young became acquainted with Frank Rosenbaum. Issue 1 In the latter part of 1949, R. C. Jacobs and Joseph Rosenbaum discussed the organization of a corporation which would have an office in Washington, D.C. The corporation was organized under the laws of Delaware; it was called the Commercial Insurance Agency, Inc.; and it served the purpose of its organizers from December 1949 until it was dissolved on May 1, 1951. This corporation is referred to hereinafter as the Agency corporation or as Agency. The cash receipts record of Agency shows that R. C. Jacobs paid $1,000 for 1,000 shares of stock in Agency; Joseph Rosenbaum paid $1,000 for 1,000 shares; and J. C. Windham paid $2,000 for 2,000 shares. Young subscribed for 2,000 shares on December 1, 1949. An entry was made in Agency's journal in December 1949 debiting loans receivable *321 for $2,000. The journal entry is as follows: "To record the sale to E. Merl Young of 2,000 shares of Capital Stock par value $1,000." The general ledger of Agency reflected a credit to Young on December 1, 1949, in the capital stock account in the amount of $2,000. The loans receivable account in Agency's ledger has an entry debiting Young as of "12/15" with $2,000. That entry refers to a journal entry. Although Young subscribed to stock in Agency in December 1949, the entry in the loans receivable account in the ledger which was entered as of "12/15" appears among debit entries in the loans receivable account in 1950 after a debit entry charging a loan to Young on April 28, 1950. According to Agency's minute book, the elected directors were Young, George F. Smith, Jr., and M. D. Rosenberg, Jr.; and the officers were Young, president; M. D. Rosenberg, Jr., vice president; and George F. Smith, Jr., secretary and treasurer. A bank account of the Agency corporation was opened at the American Security & Trust Company in Washington. To what extent, if any, Commercial Insurance Agency, Inc., had any insurance business of its own is not shown. Young did not have and he did not acquire *322 an insurance broker's license in the District of Columbia or anywhere else. He had not ever had any experience in any insurance business activities. He had never sold and he did not sell any insurance. The Rosenbaum law firm made loans to Agency, and Agency made repayments. On the check stubs of Agency's check book entries were made showing loans in 1950 from the Rosenbaum law firm to Agency aggregating $10,375, and repayments to the law firm in 1950 totaling $8,300. An entry on a check stub in Agency's check book recording the receipt of $1,500 from the law firm is as follows: "8-4-50. Deposited $1,500-Loan E.M.Y. Goodwin, Rosenbaum, Meacham & Bailen." The only employees of Agency were Young and one clerk. The check stubs in Agency's check book show checks drawn on Agency's bank account to pay rent, telephone answering service, telephone bills, and bills of various hotels, clubs, and liquor stores. A check stub shows that a check for $167 was drawn on February 6, 1960, payable to F. L. Jacobs Co., for stationery. The following is a summary made from check stubs showing the total amounts of checks drawn on Agency's bank account during 1950 and 1951 which were payable to hotels, *323 clubs, florists, and liquor stores: Congressional Country Club, Inc. (En-
tertainment)
$1,032.16
Chatterbox Club (Entertainment)
398.75
Statler Hotel, Inc.
226.35
Waldorf-Astoria
327.67
Savoy-Plaza, Inc.
8.29
Liquor stores
706.17
Florist
83.27
Bertram Shrier, Ltd. (Entertainment)
186.25
$2,968.91
A check, No. 507, of the Agency corporation dated December 15, 1949, in the amount of $1,279.45, which was made payable to Young, was signed by him as president. Young deposited the check in his personal bank account in the Hamilton National Bank in Washington, D.C., on December 19, 1949. There was written, first, on the check stub the following: "E. Merl Young (pay check) (Dec. 1,-Dec. 14)." Later, the words, pay check and the dates were crossed out and the word, "Loan" was written on the check stub in a different handwriting than the writing making the first entries on the check stub. The word, loan, was written on the check stub by an accountant, Hoffman, in April 1950 when he set up accounting books for the Agency corporation in April 1950. The check stub for check number 508 of the Agency corporation bears the following writing: "Dec. 15, 1949-Virginia *324 Steele (pay check) (Dec. 1-Dec. 14), $89.05." No changes were made in these entries on this check stub. Virginia Steele was the clerk employed by the Agency corporation. In his income tax return for 1949, Young did not report the receipt of income from Commercial Insurance Agency, Inc., in the amount of $1,279.45. From January 4, 1950, until June 21, 1950, on various dates, 10 checks of the Agency corporation, payable to Young, were made out and were signed by Young as president. Each check except one was for the amount of $1,279.45. One check dated April 11, 1950, was for twice that amount, $2,558.90. Young deposited all of the checks in his personal bank account in the Hamilton National Bank. The total amount of these checks is $14,073.95. The following schedule lists the check numbers, the dates, and the amounts of the checks of the Agency corporation which were paid to Young during 1950: Check
No.
Date
Amount
512
1- 4-50
$ 1,279.45
521
1-20-50
1,279.45
524
1-31-50
1,279.45
531
2-14-50
1,279.45
536
2-28-50
1,279.45
553
4-11-50
2,558.90
556
4-17-50
1,279.45
565
4-28-50
1,279.45
574
5-17-50
1,279.45
590
6-21-50
1,279.45
$14,073.95
*325 In his return for 1950, Young did not report the receipt of any of the above amounts of income from the Agency corporation. However, Young did report in his 1950 return the receipt of $1,900, and no more, from Commercial Insurance Agency. The check stubs of the checks listed above bear the same dates and amounts as the checks. The stubs for checks 553, 556, and 574 are in Young's handwriting. The stubs of the last 3 checks, 565, 574, and 590 do not have any explanation or designation of the nature of the payment covered by those checks. The stub for check 512 bears the writing, "(pay check) (Dec. 15-Dec. 31)" with lines scratching out those designations. In a different handwriting the word, "Loan," is written above the original writing of the words, pay check. The stub for check 521 has the explanation, "(Jan. 1-Jan. 14)," which was not crossed out. In a different handwriting the word, loan, was written subsequently. The word, loan, was written subsequently on stub 524, designated "(Jan. 15-Jan. 31)"; on stub 531, designated "(Feb. 1st-14th)"; on stub 536, designated "(Feb. 15-Feb. 28)"; on stub 553, designated "March Salary"; and, on check 556, designated "Salary." The *326 word, loan, was written on the check stubs in April 1950 by the accountant, Hoffman, who in this way altered the check stubs. Young did not receive from the Agency corporation any check in the amount of $1,279.45 after June 21, 1950, at which time he returned to the employ of the F. L. Jacobs Company. On or about the same dates in 1950 as checks of Agency corporation were made to Young, checks were also made to the other employee, either Virginia Steele or Marie L. Sayman, according to the check book stubs, and notations were made on those stubs indicating the pay period covered and, in most instances, the word, salary, payroll, or pay check, was written. However, none of those check stubs were altered and the word, loan, was not written on any of them. The cash receipts book and the bank deposit book of Agency contain entries showing that on February 28, 1950, Young made a cash payment to the corporation of $406.85, which was deposited in Agency's bank account. The cash book contains the following explanation: "Washington Insurance Agency - Commission on insurance of E. Merl Young-Loans Receivable." Young purchased an insurance policy on himself from Washington Insurance Agency. *327 He received a rebate in the above amount and turned it over to Agency. In the loans receivable account in Agency's accounting books an entry was made under the date February 28, 1950, crediting E. Merl Young with a payment of $406.85 on account of loans. In the journal of Agency there are entries showing that in December 1950 officer's salary was debited $1,900, and loans receivable was credited $1,900, to record "salary paid to officer." This item is the same as the receipt of $1,900 from Commercial Insurance Agency which Young reported in his return for 1950. Young did not withdraw $1,900 but it was credited to him in the loans receivable account on December 31, 1950, as a repayment on account of loans. The bank deposit book of Agency shows a deposit in its bank account on June 21, 1950, in the amount of $2,500. A duplicate bank deposit slip of the American Security & Trust Company, Washington, D.C., to the credit of Commercial Insurance Agency, Inc., dated June 21, 1950, bears an entry as follows: "Checks as follows - Nat'al Bank of Detroit $2,500." An entry was made in Agency's loans receivable account under the date June 21, 1950, crediting $2,500 to E. Merl Young in repayment *328 of a loan. The deposit of $2,500 in Agency's bank account on June 21, 1950, was the deposit of a check to Young from the F. L. Jacobs Company which he endorsed and deposited to the account of Agency. Young drew checks on his personal bank account at the Hamilton National Bank dated November 21, 1950, for $5,000, and December 8, 1950, for $4,000, payable to Commercial Insurance Agency, Inc. In the lower left corner of each check is written, "Repayment of Loan." He endorsed each check, "For deposit only - Commercial Insurance Agency, Inc." Both checks were deposited in Agency's bank account. In Agency's loans receivable account entries were made on November 21, 1950, and December 8, 1950, crediting loans to E. Merl Young with the respective amounts of $5,000 and $4,000. Young drew 2 checks on his Hamilton National Bank checking account payable to Commercial Insurance Agency, Inc., dated February 28, 1951, for $200, and March 9, 1951, for $200. Entries were made in Agency's loans receivable account showing a credit of $200 on February 28, 1951, and a credit of $200 on March 15, 1951. Young's name is not noted in these credit entries. Check stubs in Agency's check book bear entries *329 under the date of February 28, 1951, and March 9, 1951, showing deposits in its bank account of $200 on each date. An explanation was noted, "E. Merl Young." In Agency's loans receivable account, debit entries were made charging E. Merl Young, as a borrower, with loans to him in the amounts of Agency's 10 checks to him in 1949 and 1950 for $1,279.45, each, and for the 1 check for $2,558.90 (check 553 dated April 11, 1950). In addition, debit entries were made in the loans receivable account charging Young with loans in the following amounts: May 31, 1950, $1,000; August 4, 1950, $314; August 10, 1950, $1,000; and September 14, 1950, $1,500. Reference has been made above to a debit dated "12/15" to Young in the loans receivable account for his subscription for 2,000 shares of stock in Agency. The check stubs in Agency's check book show that checks of Agency payable to Young were drawn on May 31, 1950, for $1,000 (check 581); on August 10, 1950, for $1,000 (check 610); and on September 14, 1950, for $1,500 (check 624). Also, check 608 dated August 4, 1950, for $314 was made payable to "Jaffe." It apparently represents the debit to Young on August 4, 1950, for $314 in the loans receivable *330 account, since there is no other check stub for a check for $314 in Agency's check book. In the loans receivable account of Agency, except for the credit to Young of $406.85 on February 28, 1950, for the rebate of part of the payment for insurance on Young, all of the credits to Young in 1950 were made under dates beginning on June 21 and ending on December 31. The following schedule shows all of the debits and credits in Young's name in Agency's loans receivable account and the order in which the debits were entered during 1949 and 1950. Debits
1949
Dec. 15
E. Merl Young
$ 1,279.45
1950
Jan. 4
E. Merl Young
1,279.45
Jan. 20
E. Merl Young
1,279.45
Jan. 31
E. Merl Young
1,279.45
Feb. 14
E. Merl Young
1,279.45
Feb. 28
E. Merl Young
1,279.45
Apr. 11
E. Merl Young
2,558.90
Apr. 17
E. Merl Young
1,279.45
Apr. 28
E. Merl Young
1,279.45
Dec. 15
E. Merl Young
2,000.00
May 17
E. Merl Young
1,279.45
June 21
E. Merl Young
1,279.45
May 31
E. Merl Young
1,000.00
Aug. 10
E. Merl Young
1,000.00
Sept. 14
E. Merl Young
1,500.00
Aug. 4
E. Merl Young
314.00
Total
$21,167.40
Credits
1950
Feb. 28
E. Merl Young
$ 406.85
June 21
E. Merl Young
2,500.00
Nov. 21
E. Merl Young
5,000.00
Dec. 8
E. Merl Young
4,000.00
Dec. 31
E. Merl Young
1,900.00
$13,806.85
*331 The debits in 1949 and 1950 exceeded the credits by the amount of $7,360.55. The total amount of the debits to Young during 1950 in the loans receivable account, including the debit of $2,000 for Young's subscription in 1949 for stock in Agency, was $19,887.95, which amount exceeded the credits by the amount of $6,081.10. Young did not give Agency any note or notes for any of the debits to him in Agency's loans receivable account. The check stubs of Agency's check book show that Young received additional checks from Agency in 1950 in the total amount of $1,237.76, and a check in 1951 for $300 for (according to the check stubs) general expenses and travel expense. No part of the above amounts was debited to Young as loans in the loans receivable account. At the time of the dissolution of Agency on May 1, 1951, Agency owned some office furniture. Young did not receive any of the furniture or any proceeds therefrom. Issue 2 Among the clients of the Rosenbaum law firm were the F. L. Jacobs Company (of which Young was a vice president), and Federal Machine and Welding Company, the second largest stockholder in the Lustron Corporation (in which Young was a vice president). *332 Another client was the Barium Steel Corporation, a holding company having an office in New York City, and all of its 20 operating subsidiaries. The Rosenbaum law firm acted as counsel to Barium Steel and its subsidiaries in tax matters. One of the subsidiaries of Barium Steel is Central Iron and Steel Company having its plant in Harrisburg, Pennsylvania, hereinafter called Central Steel. Central Steel manufactures and sells steel. Rudolph Eberstadt is president of Barium Steel and vice president of Central Steel. Central Steel applied to and obtained 2 loans in 1949 from RFC in amounts of around $6,350,000, and it had another loan application pending before RFC in 1950 for around $1,000,000. The Rosenbaum law firm was counsel to Ceneral Steel in matters pertaining to its applications to RFC for loans, and it processed its applications for 3 separate loans. RFC, in April 1950, denied Central Steel's application for a loan of $1,000,000. Central Steel applied for reconsideration of its application and the matter was pending in the summer of 1950. The war in Korea began in about June 1950. There was a shortage of steel, including steel plate, in 1950 and 1951. In May or June *333 of 1950, Joseph and Frank Rosenbaum began discussions with Rudolph Eberstadt about an arrangement whereby the Rosenbaum law firm, or a corporation which it would acquire, would acquire some steel from Central Steel. The Rosenbaums were able to get a commitment for 2,500 tons of steel plate under circumstances set forth hereinafter. An agreement was made in August 1950 under an exchange of letters of confirmation. Shipments began on September 7, 1950. It was agreed that whomever the Rosenbaum firm represented would realize $40 per ton out of the transaction, or $100,000. Eventually, $100,000 was received by a corporation, Atlantic Basin Iron Works, hereinafter called Atlantic Basin. On September 21, 1950, the Rosenbaum law firm entered into an agreement with Blair Holdings Corporation (drafted by Frank Rosenbaum) under which, for $1,000, the law firm received from Blair an option exercisable at any time before March 21, 1952, to purchase from Blair all of the capital stock of Rialb Corporation, hereinafter called Rialb. On that date the law firm paid Blair $1,000. Blair, an investment banking concern having its office in New York City, owned all of the stock of Atlantic Basin. Blair *334 was originally known as Blair and Company. The Rosenbaum law firm had close and friendly relations with Blair and its president, V. B. Dardi. Blair owned 80 per cent of the stock of Rialb and held an option to acquire the balance. Blair had acquired all of the stock of Atlantic Basin in 1947 and had transferred that stock to Rialb in January 1948. Blair planned selling the assets of Atlantic Basin to recover what it had paid for the stock of Atlantic Basin. Frank had an understanding with Blair that he would be elected a vice president and director of Atlantic Basin immediately following the execution of the option agreement, and, also, that the Rosenbaum law firm would be allowed to transfer contracts to Atlantic Basin. Atlantic Basin is a New York corporation which was organized in 1902, and had engaged in the business of making ship repairs and conversions until about 1948 when a process of selling its assets started, and it began getting out of the shipyard business. It had a plant and yard in Brooklyn. However, in 1950 its new address was 44 Wall Street, New York, which also was the address of Blair. Its office was in the office of Blair. P. J. Weldon was the president of *335 Atlantic Basin and his office was in the Blair office, also. The option agreement between Blair and the Rosenbaum law firm provided that all of the assets of Rialb and Atlantic Basin existing as of the option date, plus the proceeds on all earnings attributable to these assets, would be transferred to Blair prior to the exercise of the option, except as to certain litigable rights which Blair might keep in Rialb, which would be turned over to Blair at any date thereafter at Blair's discretion. The total option price to be paid by the Rosenbaum law firm for the Rialb stock was $9,000, if the option was exercised by August 21, 1951, after which date it increased to $24,000. The Rosenbaum law firm, pursuant to said option agreement, was to acquire the corporate shells, devoid of any assets, of Rialb and Atlantic Basin. Atlantic Basin had a net operating loss carryover as of December 31, 1949, available for use in the years 1950 and 1951, in the amount of $1,160,410.59 arising from a loss of $857,317.74 in 1948, and a loss of $303,092.85 in 1949. The steel transaction with Barium and Central Steel, mentioned above, involved Price Iron and Steel Company, hereinafter called Price. *336 It has its office in Chicago, is engaged in the business of buying and warehousing steel for resale, and buying and selling iron and steel scrap. It handles, chiefly, steel plate and structural steel. It is a wholesale dealer. It purchases steel from steel mills. The practice generally is to obtain allotments of steel from steel mills under which monthly deliveries are made. At times, Price handled around 56,000 tons of steel a month. Robert B. Bregman, an employee of Price, was associated with it in 1950 and during earlier years, and was the secretary of the company in 1950. He held that office until July 1953. Price had been a customer of Central Steel since 1949, and Bregman handled the transactions. As of the summer of 1950, Price had been purchasing a considerable amount of steel from Central Steel, and at times in 1950 it had monthly allotments which amounted to as much as 7,000 to 12,000 tons a month. Bregman was acquainted with Eberstadt and had had dealings with him prior to the summer of 1950. Frank Rosenbaum met Bregman through Eberstadt. In the wholesale steel business in 1950 it was not unusual for a concern like Price to pay commissions to others, such as sales *337 agents, for obtaining steel from mills, and Price sometimes paid such commissions. At the time that the Rosenbaums began discussing with Eberstadt (of Barium) the matter of a transaction involving steel, Eberstadt was acquainted with Frank's efforts to obtain an option from Blair to acquire all of the stock of Rialb and Atlantic Basin. Soon after the execution of the option agreement of September 21, 1950, with Blair, Frank advised Eberstadt that the law firm had obtained the option to purchase the Rialb stock. Frank Rosenbaum was elected vice president of Atlantic Basin at a special meeting of its directors on November 9, 1950, and he became a director just prior to that date. The steel transaction involved here developed in the following way: First, before August 1950, Eberstadt assured the Rosenbaums that 2500 tons of steel plate would be made available for the transaction. Eberstadt decided that Barium's subsidiary, Central Steel Company, would supply the steel plate. Price was a customer of Central and Bregman handled orders to Central. Bregman was told by Eberstadt or someone at Central Steel not later than shortly before August 19, 1950, that Price could have an additional *338 2500 tons of steel plate over and above Price's allotment from Central. Price had a buyer, Westinghouse, and Bregman replied that Price would like to take the 2500 additional tons. This understanding was followed up by Bregman's sending a letter of Price dated August 19, 1950, to Eberstadt with a purchase order to Central enclosed bearing the same date for 2,500 tons of steel plate to be shipped 500 tons per month beginning in September 1950 for 5 months through January 1951. The order to Central stated the specifications; it was purchase order 92947; and in it Price agreed to pay Central $3.85 per cwt., or $77 per ton. According to the letter the order had been arranged by Eberstadt. The letter in part stated as follows: As arranged with you, the mill base price to be used on this order is to be the same as on our Purchase Order #92772 calling for 8000 tons of Steel Plate, and our Purchase Order #92845 calling for 4000 tons of Steel Plate - viz., $3.85 per cwt. base f.o.b., Harrisburg, Pennsylvania
You also requested from the writer while he was with you in New York on Friday that we forward along with this order the 500 tons of specifications for September 1950, * * * On *339 August 19, 1950, Price Steel Company sent a letter signed by Bregman, bearing the same date, to Elberstadt, as president of Barium Steel which referred to Price's order, No. 92947, and which set forth the specifications for the September shipment and requested that the specifications be forwarded to Central Steel's mill. In this letter, Price specified that the steel was to be shipped to Westinghouse Electric Corporation in Sharon, Pennsylvania. On August 25, 1950, F. L. Steuber, general sales manager of Central Steel, sent a letter to Bregman acknowledging the receipt of his two letters of August 19th, addressed to Eberstadt, together with Bregman's "blanket order #92947, dated August 19th." Steuber, in his letter, described the above order of Price as "an additional 2,500 tons of plates to be shipped at the rate of 500 tons per month from September 1950 to January 1951." Shipments of steel pursuant to purchase order No. 92947 by Central Iron and Steel Company commenced on September 7, 1950. Price Steel began to accrue commissions payable of $40 per ton on the 2,500 tons of steel covered by purchase order 92947 in a commissions payable account on September 11, 1950. Before *340 Bregman sent the August 19 letter he understood and agreed about a "commission" which Price would pay per ton. This was part of the transaction covered by order 92947 but it was never reduced to writing. The commission Price was to pay in order to obtain the extra allotment of 2,500 tons of steel plate was $40 per ton, or $100,000. Westinghouse was willing to buy the steel from Price for $127 per ton and Central Steel (the steel mill) was to charge $77 per ton, leaving a differential of $50 per ton, of which Price was to retain $10 as its profit, and was to pay out $40 as a commission. Price was willing to enter into the whole arrangement. As is stated hereinafter, the first actual payment on account of the agreed commissions was made by Price on October 17, 1950, by a check payable to the Rosenbaum law firm in the amount of $20,000. Bregman's explanation is that "someone somewhere along the line" asked Price to send the Rosenbaum firm a check for commissions of $20,000. When the check was sent, the accrued commissions on order 92947 was only $11,279.15, so that part of the $20,000 was an advance of commissions. At sometime after Price started accruing commissions on September 11, 1950, and *341 after October 17, 1950, Bregman was advised that the checks for commissions should be sent to Atlantic Basin and that Frank Rosenbaum represented Atlantic Basin, with whom Bregman had dealings. The Central Steel mill shipped all of the steel for Price's account to Price's customer, Westinghouse. Central Steel submitted invoices to Price for the shipments of steel under order 92947. Atlantic Basin never submitted any invoices to Price for the sale of steel under the same order. Price accrued commissions in its commissions payable account under this order according to carload shipments from September 11, 1950, to and including May 3, 1951. The amounts of the commissions per carload of shipments of steel by Central Steel were in amounts ranging from around $107 up to $1,000 or $2,000. The total amount of commissions accrued during the months of September through December 1950 and in January 1951 through May 1951 were somewhat in excess of $100,000 but the excess amount of commissions was due to normal overweight and extras. The following schedule shows the total amount of commissions accrued by Price from September 1950 through May 1951, inclusive: 1950
Month
Amount
September
$ 8,636.24
October
6,662.00
November
25,607.40
December
18,198.80
1951
January
20,936.90
February
8,096.70
March
8,205.10
April
6,805.60
May
1,071.30
$104,220.04
*342 As steel was shipped by Central Steel, Central Steel sent invoices to Price at mill price, plus extras. Price made payments to Central Steel at the mill price of $77 per ton. On October 17, 1950, Price issued a check in the amount of $20,000 payable to the Rosenbaum law firm, which amount represented accrued commissions payable under purchase order 92947, as was stated in the remittance advice forwarded with the check. The law firm endorsed the check and deposited it in its bank account. In its commissions payable account under the order, Price debited the payment as having been made to the Rosenbaum law firm. On October 20, 1950, the Rosenbaum law firm issued its check to Young for $10,000 which Young deposited in his bank account in the Hamilton National Bank in Washington, D.C. Mention has been made above of the agreement of September 21, 1950, between the Rosenbaum law firm and Blair under which the law firm had the option to purchase all of the stock of Rialb. The law firm's arrangements with Blair proceeded gradually after September 1, 1950. Atlantic Basin was in the process of selling the remainder of its assets. In the early part of 1950 all of its land and buildings *343 were sold. According to the option agreement of September 21, 1950, with Blair, all of the assets of Atlantic Basin were to be transferred to Rialb prior to July 21, 1951, and, also, all of the assets of Rialb were to be transferred to Blair by the same date. Atlantic Basin had a net operating loss carryover as of December 31, 1949, available for use in the years 1950 and 1951, in the amount of $1,160,410.59, arising from a loss of $857,317.74 in 1948 and $303,092.85 in 1949. Since the plan of Blair, Rialb, and Atlantic Basin was to liquidate and dispose of the assets which Atlantic Basin had used formerly in the business of ship repairs, the business designation for Atlantic Basin in 1950 in its audit report was "commodities and real estate," although in the summer of 1950 Atlantic Basin was not carrying on any transactions. Certain litigation was the cause of delays in the Rosenbaum law firm's exercise of its option to purchase all of the stock of Rialb Corporation. In the meantime Frank Rosenbaum was in close touch with those who were in charge of Rialb Corporation which was inactive and he made arrangements to have the commissions from the steel transaction handled by Atlantic *344 Basin. A record was made indicating that Atlantic Basin had placed an order for its account with Central Steel for 2,500 tons of steel plate, the same transaction which had been confirmed by the letters of August 19, 1950, and August 25, 1950, between Price and Central Steel. Accordingly, a letter on Atlantic Basin's letterhead, dated November 17, 1950, was sent to Barium Steel from Atlantic Basin under the name of Frank Rosenbaum, vice president, which had the same details as had been covered in Bregman's letter to Eberstadt on August 19. Another letter was dated back to Cotober 1, 1950, on a letterhead of Atlantic Basin and sent to Price, attention of Bregman, confirming a sale to Price of 2,500 tons of steel plate to be shipped by Central Steel at the rate of 500 tons per month "commencing October 1." Atlantic Basin's letter to Barium Steel dated November 17, 1950, was acknowledged by Eberstadt on a letterhead of Central Steel under the date of October 1, 1950, dated back to October 1, which was addressed to Atlantic Basin, attention of Frank Rosenbaum, confirming the sale to Atlantic Basin of 2,500 tons of steel plate to be shipped at the rate of 500 tons per month commencing October *345 1st. The above 4 letters refer to the identical order for 2,500 tons of steel which Price confirmed to Central Steel and set up on its books as order 92947 referred to above. All of the letters refer to one and the same transaction. The next payment of commissions by Price on the order for 2,500 tons of steel, No. 92947, was made on November 16, 1950, when Price sent a check for $30,000 to Atlantic Basin which then set up an account on its books designated order number 92947. Atlantic Basin's account referred to a mill price of $77 per ton. It showed that the check from Price was deposited by Atlantic Basin in its account on November 17, 1950. On November 16, 1950, the Rosenbaum firm issued its check in the amount of $20,000 to Price in repayment of the amount which Price had sent to the law firm on October 17, 1950. Price credited the $20,000 back to its commissions payable account. Price's check for $30,000 represented accrued commissions under order 92947 which had been accrued since the first delivery of steel on September 7, 1950. On November 17, 1950, Atlantic Basin issued a check in the amount of $15,000 to Young which was deposited in his bank account in the Hamilton *346 National Bank in Washington, D.C. On November 22, 1950, Young gave his check to the Rosenbaum law firm in the amount of $10,000 which represented a return to the law firm of the $10,000 which it had paid to Young on October 20, 1950. After the first check of Price to Atlantic Basin dated November 16, 1950, Price made periodic payments to Atlantic Basin and debited the payments to it in its commissions payable account. Atlantic Basin deposited the checks in its bank account. The dates of statements and checks of Price to Atlantic Basin during the remainder of 1950 were November 30, 1950, when a check for $10,000 was sent to Atlantic Basin; December 13, 1950, when another check for $10,000 was forwarded; and December 22, 1950, when a check for $5,000 was forwarded. Altogether, Price forwarded commissions in the amount of $55,000 to Atlantic Basin during 1950 During 1951 Price sent checks of $5,000 or $10,000 periodically during January, February, March, and April which aggregated $45,000. Atlantic Basin deposited these checks in its bank account. The payments of Price to Atlantic Basin were designated commissions. The books and records of Atlantic Basin show that purported loans *347 were made to Young beginning on November 17, 1950, through January 30, 1951, in the total amount of $32,666.66, which included the amount of $15,000 referred to above; and that a loan of $3,000 was made to Young's brother, Otis, on November 29, 1950. The following schedule shows the payments of Price to Atlantic Basin, the dates thereof, the payments of Atlantic Basin to Young and his brother, and the dates thereof: Payments
Price to Atlantic Basin
Date
Amount
11-16-50
$30,000
11-30-50
10,000
12-13-50
10,000
12-22-50
5,000
$55,000
1-12-51
$ 5,000
1-22-51
5,000
1-26-51
10,000
2- 7-51
5,000
2-23-51
5,000
3-15-51
5,000
4- 2-51
5,000
4- 9-51
5,000
$45,000
Payments
Atlantic Basin to Young
11-17-50
$15,000.00
12- 6-50
6,000.00
12-18-50
5,000.00
1-26-51
3,333.33
1-30-51
3,333.33
$32,666.66
11-29-50
3,000.00 (Otis)
$35,666.66
Young received from Atlantic Basin $32,666.66. Young gave notes to Atlantic Basin for the several payments to him. The Subcommittee of the Committee on Banking and Currency of the United States Senate conducted a study of the Reconstruction Finance Corporation during February and March *348 of 1951, which is known as the Fulbright Hearings. E. Merl Young and Joseph N. Rosenbaum were examined at the Fulbright Hearings about the steel deal commissions and Atlantic Basin Iron Works. When the Rosenbaum law firm entered into the option agreement with Blair on September 21, 1950, the law firm paid Blair $1,000 for the option to purchase all of the stock of Rialb. Shortly thereafter, Joseph and Frank Rosenbaum purportedly offered to sell Young a one-half interest in the option for $500, and Young gave his personal check for $500 payable to the law firm on September 28, 1950. Young's payment was initially entered on the law firm's books as a payment for services, but in January 1951, the same amount was transferred to another account in the law firm's books called "Investments," with an entry stating that the transfer was to correct an error in the accounting for Young's payment of September 28, 1950, which should have been credited to the investment account for a one-half interest in the Atlantic Basin stock. Frank Rosenbaum was president of the Independent Pan-American Oil Company and he maintained its checkbook in which the entries are in his handwriting. This corporation *349 was wholly owned by Frank Rosenbaum, Joseph Rosenbaum, and Joseph's wife. On November 8, 1951, Atlantic Basin transferred $86,000 to Independent Oil Company; and on November 14, 1951, Atlantic Basin made a second transfer of money, $25,000, to Independent Oil, a total sum of $111,000. These transfers were treated as loans for which Independent Oil gave notes. In the checkbook of Independent Oil on a check stub, notations were made to describe the issuance of a check on November 8, 1951, for $24,000 as follows: "Goodwin, Rosenbaum & Meacham for Exercise of option on Rialb Corporation stock." On or about November 8, 1951, all of the Rialb stock, 1,000 shares, was purchased for $24,000 under the option given by Blair to the Rosenbaum firm on September 21, 1950. On June 18, 1951, Young, by letter, authorized Frank Rosenbaum to act for him in making a sale of his interest in "the option on Atlantic Basin Iron Works stock." On November 9, 1951, Frank wrote Young that Young's "one-half interest in the option" on the stock of Rialb had been "disposed of" for $43,000, and he enclosed with the letter a check of Independent Oil for $979.81 together with the notes of Young to Atlantic Basin, *350 a note of Otis Young to Atlantic Basin, and a note of Young to Joseph Rosenbaum, all notes marked paid. Frank, in his letter, accounted for the difference between $43,000 and $979.81, $42,020.19, as follows: Repayment M. Young loans from
Atlantic Basin
$32,666.66
Repayment O. Young loan from
Atlantic Basin
3,000.00
Repayment M. Young loan from
J. Rosenbaum
6,353.53
Total
$42,020.19
On November 9, 1951, 2 checks were drawn on a bank account in the name of Independent Pan-American Oil Company payable to Atlantic Basin, one for $32,666.66, and one for $3,000. Independent Pan-American Oil Company was organized in about November 1951. The stubs of the checkbook of Independent Pan-American Oil Company which had a bank account with the American Security & Trust Company in Washington, D.C., show the following: On November 8, 1951, Independent Oil received $86,000 from Atlantic Basin. A check dated November 8, 1951, was made payable to the order of the Rosenbaum law firm for the exercise of the Rialb stock option in the amount of $24,000, leaving a balance of $62,000. On November 9, 1951, a check of Independent Oil Company was made payable to Atlantic Basin *351 for payment of a loan to E. M. Young, charged to the purchase price of option, in the amount of $32,666.66, leaving a balance of $29,333.34. On Nov. 9, 1951, a check of Independent Oil made payable to Atlantic Basin was drawn to repay a loan to Otis Young, to be charged to purchase price of option, in the amount of $3,000, leaving a balance of $26,333.34. On November 9, 1951, a check of Independent Oil made payable to J. H. Rosenbaum in payment of a loan to Young, to be charged to purchase price of option, was drawn in the amount of $6,500, leaving a balance of $19,833.34. On November 9, 1951, a check of Independent Oil was drawn to Young in payment of the balance of the purchase price on the option in the amount of $979.81, leaving a balance of $18,853.53. On November 14, 1951, Independent Oil received a loan from Atlantic Basin in the amount of $25,000, bringing the balance in the bank account up to $43,636.34 (after an expense item of $217.19). On November 17, 1951, a check of Independent Oil was drawn to the Rosenbaum law firm in the amount of $43,000 to be charged to the purchase price of option, leaving a balance in the account of $636.34. The Federal income tax returns filed *352 by Rialb and its subsidiary, Atlantic Basin, for 1950 and 1951 reported no income tax liability. Frank Rosenbaum acted as attorney for petitioner and his wife in all Federal income tax matters relating to the years 1949, 1950, and 1951 under their power of attorney which has not been revoked. Young was indicted for perjury in the District of Columbia on February 28, 1952, for wilfully making false statements, contrary to oath, on or about February 21, 1951, February 27, 1951, and December 17, 1951, during the hearings of the Subcommittee of the Committee on Banking and Currency of the Senate and the Grand Jurors. On April 30, 1953, he was convicted upon his plea of not guilty. The sentences imposed on 4 counts, to run concurrently, were a maximum of 2 years, of which he served 18 months. Ultimate Facts Young was an employee of Commercial Insurance Agency, a controlled corporation, from December 1, 1949, to June 21, 1950. Beginning on December 15, 1949, and through April 17, 1950, Agency paid him a salary at the rate of $1,279.45 for two-week periods of employment. At the time each payment was made, including the payment of April 17, 1950, it was paid by Agency as salary, and *353 such payments were not loans to Young. For his services, Young was paid compensation of $1,279.45 in 1949, and at least $10,235.60 in 1950. In the latter part of April 1950, Young was advised by an accountant who was employed by those who controlled Agency that on the books of Agency then being set up, all payments to him at the rate of $1,279.45 would be shown as loans in a general loans receivable account. Thereafter, payments to Young aggregating $3,838.35 were not made as salary payments and it was understood that Young would make repayments thereof. In addition to the above payments, Agency made loans to Young in 1950 on May 31, August 4, August 10, and September 14 in the total amount of $3,814. The total amount of Agency's loans to Young in 1950 was $7,652.35. Young paid Agency $13,806.85 during 1950 of which $7,652.35 constituted repayment of his indebtedness, and the excess, $6,154.50 represented a voluntary repayment of salary received in 1950. Young did not make any payment for stock of Agency. At the time Agency was dissolved, Young did not owe Agency any amount. The net amount of salary from Agency which Young received in 1950 was $4,081.10, none of which was included *354 in Young's return. In August 1940, an agreement was made through an exchange of letters between Central Steel as the seller of 2,500 tons of steel plate and Price Steel as the purchaser that Central would make the steel available to Price. Central began the shipments on September 7 to Price's vendee, Westinghouse. Atlantic Basin did not acquire and sell 2,500 tons of steel. Nevertheless, under the arrangements with Eberstadt which culminated in the above agreement, a "commission" or bonus of $40 per ton was to be paid by Price to whomever Frank Rosenbaum designated, and such payments, $55,000 in 1950 and $45,000 in 1951, were made to Atlantic Basin pursuant to Frank's direction. It was intended that payments of part of the bonus paid by Price would go to Young, as was demonstrated by the payment of $10,000 on October 20, 1950, by the Rosenbaum firm which had received a bonus payment of $20,000 on October 17, 1950. However, the agreement of Price to make the bonus payments did not involve a joint venture and Young's receipts were not those of a joint venturer. Young realized no more in 1950 and 1951 from this source than actually was distrbuted to or for him in both years. None *355 of the payments in 1950 and 1951 by Atlantic Basin to Young and his brother, Otis, were bona fide loans, and the notes received by Atlantic Basin were not evidence of a true debtor-creditor relationship. The notes were a device to disguise distributions of ordinary income and they were part of a prearranged tax avoidance plan. Until November 9, 1951, Atlantic Basin was a wholly controlled nominee of the Rosenbaum firm. On the above date, it became the wholly controlled corporation of Joseph and Frank Rosenbaum. Petitioner did not purchase any interest in the option given by Blair to purchase Rialb stock. The Rosenbaum firm alone acquired that option. Petitioner in fact did not participate in that transaction. The total amount of petitioner's share in the commissions paid by Price Steel to Atlantic Basin was $43,000, of which $42,500 was ordinary income and $500 was the return of the $500 which Young deposited with the Rosenbaum firm on September 28, 1950. Of the $43,000, petitioner received $29,000 in 1950, and $14,000 in 1951, as follows: 1950
11-17
$15,000
11-29
3,000
12-6
6,000
12-18
5,000
$29,000
1951
1-26
$ 3,333.33
1-30
3,333.33
11-9
6,353.53
11-9
979.81
$14,000.00
*356 The payment to petitioner on November 9, 1951, of $979.81 represented a repayment to him of the $500 which he had paid to the Rosenbaum firm on September 28, 1950, and $479.81 commissions, which amount was part of funds transferred by Atlantic Basin to Independent Pan-American Oil Company in November 1951. The sum of $6,353.53 was part of funds transferred by Atlantic Basin to Independent in November 1951. The sums of $6,353.53 and $979.81 were derived from commissions paid by Price to Atlantic Basin. On November 9, 1951, Independent, the wholly owned corporation of Frank and Joseph Rosenbaum and Joseph's wife, paid Joseph Rosenbaum $6,353.58 in satisfaction of an indebtedness of Young to Joseph, which amount was derived from the commissions paid to Atlantic Basin. Young realized income in the same amount from this payment for him of his debt. On the same date, Independent Oil Company paid Young $979.81, of which amount $479.81 represented income to Young. Petitioner received as his share of the commissions $29,000 in 1950, which he failed to report in income. Petitioner received as his share of commissions in 1951, the net amount of $13,500, which constituted ordinary income which *357 he did not report. The stipulated facts are found as stipulated. Opinion HARRON, Judge: Issue 1. The respondent, in determining the deficiencies for 1949 and 1950, determined that Young received salary income in those years from Commercial Insurance Agency, Inc., in the amounts of $1,279.45, and $14,073.95, respectively, which he failed to report in his returns. The respondent has maintained throughout that the payments in question represented Young's salary. By amendment to his answer, the respondent made alternative contentions but he made them for protective purposes, only, in the event it should be concluded that the payments did not constitute salary. Respondent's determination in the deficiency notice was made under section 22(a). The petitioner contends that the disputed payments were loans and that he repaid a large portion thereof. The question to be decided is whether the payments received by Young in 1949 and 1950 in the amounts above-stated constitute income within section 22(a), 1939 Code. The respondent's determination that petitioner received salary payments in the stated amounts is prima facie correct. Petitioner had the burden of proving that the determination *358 was in error. Petitioner contends first that respondent abandoned his original determination in the statutory deficiency notice with respect to 1950. This argument is evolved from the fact that respondent filed an amendment to his answer. However, the argument is groundless. Respondent raised in the amended answer allegations which specifically are alternatives to his original determination that the payments in question were salary. Furthermore, with respect to the 1950 payments, respondent's original determination in the deficiency notice was that petitioner received "total salary" from Agency in the amount of $14,073.95. It was the burden of the petitioner to prove that the payments were not salary. The respondent contends that in considering the main question under this issue, substance rather than form should be the controlling factor. Gregory v. Helvering, 293 U.S. 465; Griffiths v. Helvering, 308 U.S. 355. In this respect, he places stress upon certain circumstances, namely, the following: The lack of any clear business purpose of the corporation referred to herein as Agency, and its short span of activity during the period December 1, 1949 to *359 May 1, 1951; that the organizers included R. C. Jacobs and Joseph Rosenbaum; that Young received the payments in question at two-week intervals beginning December 15, 1949, until June 1950; and that just before the payments began and right after they ended, Young was employed by the F. L. Jacobs Company. Respondent makes the following argument: "Indeed, the evidence is clear that the Commercial Insurance Agency, Inc., itself was a sham, a fake front created solely to provide F. L. Jacobs Company with a means of continuing the payment of petitioner's salary to him during a period when it was more expedient not to have him officially on its payroll. * * * The only customer of the agency was F. L. Jacobs Company which, apparently, just transferred its insurance account to it. As soon as Young went back on Jacobs' payroll, his salary with the insurance agency stopped and the agency itself disappeared back into the shadows from which it had never truly emerged." The only testimony under this issue is Young's. Young testified that in the fall of 1949, he was working for both Lustron Corporation and F. L. Jacobs Company; that he wanted "to get away from any company that had anything to *360 do with the Government" and therefore resigned from his positions with Lustron and Jacobs; that the matter of the insurance company was discussed with Joseph Rosenbaum; that he went to work for Agency; that while he was so employed he had to have money to live on; that he went back to work for the F. L. Jacobs Company after Agency was dissolved in May 1951; and that he attempted "to pay back all the money that I [he] borrowed from the insurance company." With respect to exactly what was the nature of Agency's business, Young's testimony was vague. He referred to it as an insurance business but said, "we are working through another agency, because we didn't have the setup to take care of it." On cross-examination, Young was asked how many clients Agency had. His answer was, "The exact number I couldn't tell you. Maybe two or three." He then was asked if Agency's only client had been the F. L. Jacobs Company, or if he could recall any other than Jacobs. His response was that he could not recall any client besides the Jacobs Company without checking. The income tax return of Commercial Insurance Agency was not presented, so that whatever it might show about Agency is not before *361 us. The checkbook of Agency, containing stubs of used checks and various notations on the stubs in the nature of bookkeeping data, was received in evidence. They show that the disbursements made from Agency's bank account in addition to payments to Young and a clerk, were for rent and telephone, and payments to various clubs, hotels, and liquor stores, which are summarized in the Findings of Fact. On the whole, the record before us does not provide any information about the purposes served by Agency. Young was not licensed to sell insurance. When asked whether he had paid $2,000 for stock of Agency, Young answered in the negative, "Not that I know of." Beginning December 15, 1949, through June 21, 1950, Agency issued checks to Young in the amounts of $1,279.45, usually at two-week intervals, and on April 11, 1950, it issued one check for twice that amount, or $2,558.90. On the same dates as some of the checks to Young, a salary check was issued to the clerk employed by Agency. Up to the check to Young dated April 28, 1950, there was originally written on the stubs for checks issued to Young either "salary", or "pay check", or dates to show a period covered, such as Dec. 1-Dec. 14. *362 Beginning with the check stub of April 28, 1950, no notation was written on the stubs of checks for $1,279.45, issued to Young; that is to say, the last 3 checks. At some time after the checks and check stubs were written for the payments to Young, the original explanation on the check stub about "salary", and "pay check", and the dates of a period of about 2 weeks were crossed out and the word "Loan" was written on the check stub. Young testified that Agency's accountant, Hoffman, wrote the word loan on the stubs. Hoffman did not testify. Young's explanation was that Hoffman set up books for Agency in April 1950, that Hoffman then discussed the matter of the payments with him and "said we would have to take it out as a loan" because the company wasn't making any money. Hoffman, around the end of April, then went over the check stubs and made the entries designating as loans all of the payments to Young beginning with December 15, 1949, through April 17, 1950. Young testified, further, that while he was employed by Agency, he was not employed by anyone else, and that the payments in question were made to him to cover his living expenses. He did not testify that beginning in December *363 1949 the payments were made to him as loans. All of the evidence relating to this question has been carefully considered. The irresistible inference is that when the checks were issued to Young, beginning with the check of December 15, 1949, and ending with the check of April 17, 1950, they were salary payments. There is no evidence that at the time of each issuance, Young was borrowing funds or Agency was making a loan, or that such was intended. No notes were given and there was no promise of Young then to make repayment. There is testimony that Hoffman set up accounting books, or records, for Agency in April 1950. They are not in evidence but in the record are single sheets of 8 by 11 inches letter paper on which figures have been typed with explanations that the figures were taken from certain books, such as Agency's journal and general ledger. One exhibit is a general loans receivable account. We know nothing of the actual nature of Agency's books. However they may have been set up, it is our conclusion that the entries debiting the payments to Young in the loans receivable account, which were made around the end of April 1950, for all payments previously made to Young, are *364 not controlling or determinative of the question under consideration. "Bookkeeping entries, though in some circumstances of evidential value, are not determinative of tax liability." Doyle v. Mitchell Bros. Co., 247 U.S. 179, 187; Helvering v. Midland Mut. Life Ins. Co., 300 U.S. 216. Furthermore, Agency was a controlled corporation. It was controlled by Young and his associates, R. C. Jacobs and Joseph Rosenbaum. Bookkeeping entries were within their control. We find and conclude that Agency's payments to Young beginning on December 15, 1949, and ending on April 17, 1950, were intended to be and were salary payments when paid. For 1950, including the latter date, they totaled $10,235.60. These payments were received by Young as salary in the ordinary course of Agency's operations and were under Young's entire control. Subsequent bookkeeping entries cannot be recognized as changing the original character of these payments from salary payments to something else. Young left Agency on or soon after June 21, 1950, when he was reemployed by the F. L. Jacobs Company. *365 Thereafter, on August 4, August 10, and September 14, 1950, Agency paid to Young, or for his benefit, the sums of $314, $1,000, and $1,500; and, also, Agency advanced to Young $1,000 on May 31, 1950, a total of $3,814. No determination has been made that these payments were compensation. We conclude that they were loans. With respect to the payments to Young of $1,279.45, on April 28, May 17, and June 21, 1950, aggregating $3,838.35, we accept Young's testimony that it was understood when these payments were made that they were loans. We find and conclude that advances of Agency to Young in 1950 in the total amount of $7,652.35 (the total of the amounts referred to above) were loans. Young did not make any payments to Agency until on and after June 21, 1950, other than a payment of $406.85, a rebate on an insurance premium on insurance on his own life, which was made on February 28, 1950, which was treated by Agency, after Hoffman set up its books, as a repayment on loans. Young paid Agency from June 21 to December 8, 1950, the total sum of $11,500. On December 31, 1950, there was credited to Young in the loans receivable account $1,900 which he states was a salary payment (without *366 any explanation with respect to the date thereof, the amount, or the services involved). Young reported in his return for 1950, $1,900 as income received from Agency (the only amount he reported). Thus, petitioner paid Agency the total amount of $13,806.85 during 1950. This sum exceeded loans of Agency to Young in 1950 in the amount of $7,652.35, supra, by $6,154.50. We find and conclude that Young voluntarily repaid Agency $6,154.50 of the salary payments of $10,235.60 which he received from January 1, through April 17, 1950, and that the balance, $4,081.10 was salary income. Respondent's determination for 1950 under this issue is sustained to the extent of $4,081.10, only. It is concluded also that Young made no payment for shares of stock of Agency. Consideration has been given to a letter to Young from an attorney for Agency dated October 23, 1951, in which a demand was made for payment of the balance of an alleged debt. The attorney was and is associated with the Rosenbaum law firm. The letter was written in connection with the dissolution of Agency. Our conclusion is that the letter was a matter of form only, lacked substance, and is not entitled to any weight as proof *367 that Young was indebted to Agency in any amount when it was dissolved. We have found that Young was not so indebted to Agency. Agency was a controlled corporation. The record supports the view that it was controlled by those who were the real organizers rather than by Young, and that they, rather than Young, supplied the funds used by Agency. The corporation was merely a conduit which served a purpose which is not entirely clear. It is doubtful whether Agency served any bona fide business purpose. The general account for so-called loans receivable in Agency's books appears to have served as a running account in which entries were made to record some of the flow of funds which passed through the corporation between Young and others. Under the facts and circumstances of this case, it would be unrealistic to conclude that any of the payments made by Young to Agency which were recorded in the loans receivable account were contributions to capital. We are of the opinion also that not to give effect in 1950 to Young's repayments would result in a distortion of the actual income which Young received from Agency in 1950. The question under this issue is one of fact. Although petitioner *368 has failed to establish by competent proof that he received no salary income from Agency in 1949 and 1950, the record supports the finding that in 1950 such income was in reality not more than $4,081.10. Issue 2 The respondent included in Young's income, under sections 182(c) and 22(a), 1939 Code, one-half of the total amount of commissions paid by Price to Atlantic Basin in 1950 and 1951; i.e., he included in Young's income $27,500 for 1950, and $22,500 for 1951. This determination was made on the basis of the conclusion of the respondent that Young participated in a joint venture with the Rosenbaum firm from which so-called commissions of $100,000 were realized. The distributable shares of income of a joint venture are taxable to the participants whether or not distributions are made. Upon the petitioner was the burden of proving that this determination was incorrect. Each party takes a different view of and places a different interpretation upon the transactions which involved both the payments by Price and the acquisition of the stock of Rialb Corporation which, in turn, owned *369 all the stock of Atlantic Basin. The petitioner contends that there were two projects, the acquisition of Rialb stock, in which he was interested, and a steel transaction, in which he denies having had any interest. Petitioner claims that neither one of these two undertakings was in any respect related to the other. The respondent's view is the opposite. He contends that petitioner's only real interest was in the commissions paid by Price; that his purported participation in the option to acquire Rialb stock was a sham devised to avoid tax on the commissions at ordinary tax rates and to obtain long-term capital gain rates of tax on that income through a fictitious sale of an alleged one-half interest in the Rialb stock option; that by resorting to the device of obtaining "loans" from Atlantic Basin, he received a share of the commissions; and that the real purpose of his alleged sale of his interest in the option, the proceeds from which were used to repay the loans, was to enable him to report the commissions income as though that income had resulted from his sale of a capital asset. The respondent argues that his view represents the substance of the entire matter, and he invokes *370 the rule of putting substance above form in determining what income in reality was realized. He takes the position that two tax avoidance devices were used, (1) purported loans by Atlantic Basin to cover up the distributions of the commissions, and (2) the creation of a sham asset and a sham sale thereof to transform ordinary income into capital gain. He recognizes that by having Price pay the commissions to Atlantic Basin, income tax on the commissions would be avoided, in the first instance, because that corporation had a large net operating loss which it could carry over, which was done. Because of the net operating loss carryover, Atlantic Basin had no taxable income in 1950 and 1951. It is his theory that the sale of Young's alleged option interest for $43,000 was merely a device to reduce his tax on distributions of the commissions to him by and through Atlantic Basin. The petitioner strenuously denies all of respondent's contentions. He reported in his return for 1951 a long-term capital gain from the sale of an asset held for more than 6 months, namely, a one-half interest in an option to acquire stock of Rialb, which option was said to have been purchased in September 1950 *371 for $500, and sold in November 1951 for $43,000. He reported capital gain of $42,500, and took into account one-half thereof in computing his 1951 income and tax. The respondent eliminated the long-term capital gain. The petitioner argues that the option transaction had substance and that the respondent cannot disregard the transaction by invoking the rule of substance over form and substituting in lieu thereof an entirely different transaction. It is argued that Young, a cash basis taxpayer, did not realize $27,500 in 1950 or $22,500 in 1951 from the commissions; but that he received $43,000 in 1951 from the sale of his one-half interest in the Rialb stock option. Petitioner contends, also, that he obtained loans from Atlantic Basin in the total amount of $32,666.66; that the loans were obtained by him with Frank's assistance; that he gave a demand note for each loan, without provision for the payment of interest; and that he was agreeable to having part of the sale price of his interest in the option applied in satisfaction of his debt to Atlantic Basin. The entire record and the argument and contentions of each party have been thoroughly examined and considered. We shall state *372 first our general conclusions about the various steps which were taken. This is necessary because the parties make different contentions about what some of the steps were and when they were consummated, and a few preliminary questions must be disposed of. The only witness called by the petitioner was Frank Rosenbaum. Young testified. The respondent called Robert B. Bregman and two revenue agents, Stewart and Diehl. Rudolph Eberstadt and Joseph Rosenbaum were not called to testify. Young's testimony was in many respects evasive. He claimed to have had no knowledge about the commissions or the status of Atlantic Basin in 1950 and 1951, and to have relied wholly upon the advice and suggestions of Joseph and Frank so that everything about which the present issue is concerned was in their hands. Frank is a member of the Rosenbaum firm and he admitted that his firm has a financial interest in the outcome of this case because the Commissioner has determined that one-half of the commissions is taxable to the firm. Also, he holds a power of attorney from petitioner to represent him in matters involving his returns for the taxable years except the trial of this case. The issue requires *373 determination of the true nature of income which Young admittedly received and of the time when it was realized, all of which must be done by carefully examining the entire record, such as it is. That examination leads us to the conclusion that the answers to the questions presented are to be found in one area only, - the so-called commissions, and that the corporation Atlantic Basin was a mere conduit. Frank admitted in his testimony that Barium and Central Steel were clients of his law firm and that Eberstadt was well known to him and his brother; and that in the spring or summer of 1950 there were discussions with Eberstadt about a steel transaction. The petitioner does not deny that there was only one allocation of 2,500 tons of steel involved. The evidence clearly shows that the only bona fide, or actual, sale of that lot of steel was made by Central Steel and the purchaser was Price Steel which paid the steel mill for that commodity and resold it to Westinghouse at once. Price placed its order for the steel on August 19, 1950, and Central accepted it on August 25, 1950. Price realized a profit for itself of $10 a ton. The order, the shipments, and the payments were all made *374 in the course of the respective businesses of Central and Price. In fact, Price was a regular customer of Central. However, the arrangement for Price's payment of so-called commissions of $40 per ton is not fully and clearly explained and that arrangement was not normal, in our opinion. With respect to that arrangement, there are unexplained circumstances and gaps in the evidence. That is to say: Bregman testified that commissions are sometimes paid to agents who obtain steel from a mill for a distributor, but in this instance Price Steel was a customer of Central and had been receiving substantial monthly allotments of steel. The circumstances which were not exactly usual with respect to the $40 commissions were as follows: Through Bregman's testimony the respondent showed that the allotment of 2,500 tons of steel in August 1950 to Price originated with Central. Some undisclosed person in Central inquired of Price in August whether Price could use an additional 2,500 tons of steel over and above the allotment Price already had. Price was glad to get the extra steel; steel then was scarce; also Price had a buyer. One of the letters from Price to Eberstadt dated August 19, 1950, shows *375 that a few days before Bregman met with Eberstadt in New York City, and from the letter there is a clear inference that Eberstadt made the arrangements and suggested what Price should do; and there is the further clear inference that the 2,500 tons were made available to Price upon an understanding that Price would pay a commission of $40 per ton. But the agreement of Price to pay that commission was not put in writing. The order of Price made no reference to any commission; there was no separate written agreement or confirmation of the understanding. There is no real explanation in the record about why Price so agreed. It appears that in so agreeing Price probably reduced the profit it otherwise could have realized and was on the whole acting in an accommodating manner. The first commission paid by Price was $20,000 paid on October 17, 1950, to the Rosenbaum firm. When asked why the payment had been made to the firm, Bregman stated that along the line "someone did ask for it or we would never have mailed $20,000 out." He also said that he could not recall who the someone was, but he did not deny categorically that the someone was located in the Rosenbaum firm. Later on, about November 16, 1950, Frank *376 met with Bregman and gave him a check of the Rosenbaum firm for $20,000 to return the sum paid on October 17. Bregman testified that someone called up and mentioned that he could deal with Frank on this deal and that the Atlantic Basin Iron Works was going to get credit for the difference. Bregman stated in his testimony that "Frankly" he knew neither Atlantic Basin nor Rosenbaum. Petitioner contends that Atlantic Basin bought 2,500 tons of steel, the same lot, from Central and sold it to Price and thereby earned the so-called commissions. In support of this contention, he relies on a letter dated September 26, 1950, from Atlantic Basin signed by Frank as vice-president to Barium Steel and Central, and a letter in reply dated October 1, 1950, from Central signed by Eberstadt confirming such alleged purchase, and a letter from Atlantic Basin dated October 1, 1950, to Price which purportedly confirmed "various conversations" with Bregman and the sale to Price of the 2,500 tons of steel. These letters are patently a sham and a subterfuge. The respondent produced a letter of Atlantic Basin dated November 17, 1950, prepared for the signature of E. M. Ragsdale, president, and changed for *377 the signature of Frank, vice-president, addressed to Barium Steel with a copy to Central identical with the letter dated September 26, 1950. Respondent proved that Frank did not become a vice-president of Atlantic until November 9, 1950. The letter bearing a September date was dated back as were the letters dated October 1; i.e., Atlantic Basin was not ready for use until November; it began receiving payments from Price on November 16, 1950; the letters were a pretense resorted to in order to make it appear that Atlantic had earned commissions which were being paid by Price. The evidence does not show that Atlantic Basin bought and sold 2,500 tons of steel or acted as an agent in getting steel for Price. Price placed its order for this lot of steel on August 19; Central accepted the order on August 25; Central began making shipments on September 7; and it was not until September 21 that the Rosenbaum firm obtained the option to purchase the Rialb stock and thereby prepared to acquire Atlantic Basin. The alleged participation of Atlantic Basin in the purchase of steel by Price was a fiction. Upon a careful consideration of all of the record, we arrive at an opinion that there was *378 not an arm's length transaction in August which gave rise to bona fide commissions of $40 per ton of steel. A commission ordinarily is an agent's charge for his services in obtaining a commodity for a client. There is no proof that a third party obtained the steel for Price. Atlantic Basin did not do so. It appears from Bregman's letter of August 19 to Eberstadt that Eberstadt made the arrangements with Bregman for Central's commitment of 2,500 tons of steel. Price agreed to pay $40 per ton in addition to the mill price of $77 per ton. As far as Price was concerned the $40 per ton was for all practical purposes the same as a commission; but unless the payee rendered the services of an agent, the payment in his hands was not a bona fide commission but was something else, such as a fee. Next there is the inevitable question, "What was the original understanding of Price about to whom the $40 per ton was to be paid?" The first payment by Price of the commissions was made on October 17, 1950; a statement of Price accompanied the check of $20,000, addressed to the Rosenbaum firm attention of Joseph H. Rosenbaum, stating that the check was for "Commissions due and Advanced" under order 92947. *379 We think this is strong evidence of the original understanding which Price had. Furthermore, no one at the firm returned the check forthwith because there had been an error made. To the contrary, the check was deposited in the firm's bank account and was retained for one month, and in the meantime, on October 20, the Rosenbaum firm turned over one-half to Young. It is evident that there was a close relationship between Eberstadt and the Rosenbaums and their firm. For undisclosed reasons, Eberstadt assisted in making arrangements for the availability of the so-called commissions. One of the agents called by the respondent testified that upon questioning Frank Rosenbaum, Frank's explanation was that Eberstadt wanted them to make some money as they had represented Barium in tax matters over the years. Eberstadt did not testify, and petitioner does not make any admission about Eberstadt's interest in the general arrangements. An inference may be made that if Eberstadt had been called his testimony would not have been helpful to the petitioner. However, Frank testified that he and his brother, Joseph, had had discussions in the spring or summer of 1950 with Eberstadt, and there are several *380 letters in evidence which were sent to and received from him. The record shows without question that Eberstadt was interested. Cf., Wichita Term. El. Co. v. Commissioner, 162 F. 2d 513. We now come to the matter of the relationship of Atlantic Basin to the payments made by Price. The Rialb stock was not acquired until November 1951; thus Atlantic was not actually taken over until then. But in the option agreement with Blair of September 21, 1950, paragraph 3, the Rosenbaum firm was given the right "forthwith" to transfer to Atlantic Basin "certain contracts for the purchase and sale of steel". The Rosenbaum firm had friendly relations with the president of Blair and the office of Atlantic was in Blair's office. Soon after the Rialb option was acquired Frank told Eberstadt that the option had been acquired. It is clear therefore that the Rosenbaum firm intended to make use of Atlantic as soon as possible after it obtained the Rialb option. It developed that such time was not reached until November 1950. Contrary to petitioner's contention, we conclude that Atlantic Basin was no more than a corporate shell and that its assets were only paper. Under the arrangements *381 with Blair, insofar as the Rosenbaums made use of Atlantic during 1950 and 1951 they had complete dominion and control over that corporation. Since, as has been concluded, Atlantic did not sell any steel to Price, and since Price was advised by someone in November 1950 that it would be all right to make the payments to Atlantic, we think there can be no doubt that Atlantic received Price's payments as a mere nominee, and that it was a nominee of the Rosenbaum firm, a conduit through which the payments of Price passed. Atlantic never owned the 2,500 tons of steel; it did not sell that steel; and it rendered no services through which it earned any fees or commissions. The shipments of the steel by Central started on September 7, 1950, before the Rosenbaum firm bought the Rialb option, and Price began accruing the so-called commissions on September 11. The transaction which yielded the fees or commissions paid by Price was fixed and determined in August 1950, and for tax purposes the incidence of the tax on that income could not be shifted from those who earned it to Atlantic by any ex post facto manipulations or even by assignment. Higgins v. Smith, 308 U.S. 473. The *382 petitioner denies that he participated in or knew anything about the fees or commissions, and he also denies that he knew anything about Atlantic Basin. He claims that the first time he learned anything about these matters was when he heard testimony during the Fulbright Hearings in February and March 1951. He also asserts that he purchased and sold a one-half interest in the option to buy the Rialb stock; that he knew nothing about the value of the option; that Joseph Rosenbaum prepared for his signature a general authorization to sell his interest in the Rialb option for whatever could be obtained; that he trusted Joseph entirely; and that he was surprised that his interest was sold for $43,000; and that he had no idea who bought his interest. With respect to the sums he withdrew from Atlantic Basin, he claims that he needed money and asked Frank to arrange for loans to himself, and also to his brother Otis, and that Frank made the arrangements for Atlantic Basin to make the loans. However, the petitioner made no attempt to be specific about these things. He did not, for example, state what amounts he had asked to borrow and agreed to repay. He made no effort to explain and account *383 for the fact that the advances made to him were always made on the same day or on the day following the receipt of Price's payments, and that the amounts he received were sometimes just half of what Price paid or close to half. Young was questioned by revenue agent Stewart in November 1951 about his income tax returns and about other matters. He told Stewart that Atlantic Basin was an old shell that had been bought from Blair, that it had a large net operating loss, and that he and the Rosenbaums were going to make some large fees and commissions on steel and were going to run these through Atlantic Basin, and that they were eventually going to liquidate Atlantic Basin. Stewart so testified. Young denied making any such statement to Stewart. We are unable to accept as true Young's denials and his professions of lack of knowledge about the commissions and about Atlantic Basin. We conclude that petitioner has failed to prove by credible and competent evidence that he did not receive a share of the payments by Price, that he was a bona fide creditor of Atlantic who intended to repay loans, or that he sold an alleged interest in the option to buy Rialb stock. Young made no effort *384 to reconcile his professed ignorance about the commissions with his receipt on November 17, 1950, of a check from Atlantic for $15,000 and his payment of $10,000 to the Rosenbaum firm on November 22, 1950, as a return of the $10,000 he had received from that firm on October 20, 1950. With respect to the alleged loans by Atlantic Basin, he has not shown that when he received the funds he intended to make repayment. Bookkeeping entries must be considered in connection with all of the circumstances and in themselves are not proof of what they purport to be. Furthermore, the petitioner has not proved, in our opinion, that he made a bona fide purchase of a one-half interest in the option to buy Rialb stock. Under all of the facts and circumstances we think he did not do so. Proof of a bona fide purchase of an interest in the Rialb option might be advanced by proof of a bona fide sale thereof. We need not repeat what has been set forth in the Findings of Fact, but it is noted that Frank Rosenbaum and Joseph again employed the transparent devices of intercompany loans in the mechanics of their purported purchase of the Rialb option. We need not trace in detail those steps. We conclude that *385 petitioner has not clearly established through Frank's testimony that the Rialb option was sold in November 1951. It appears that the option was exercised and that under the agreement with Blair the Rialb stock was purchased for $24,000. It also appears that the Rosenbaum firm acted under the option. There is no proof of any assignment of the contract with Blair to Frank and Joseph. However that may in fact have been carried out, we are not able to find and conclude from the evidence before us that there was a payment by or for the Rosenbaum brothers of $86,000 for the so-called Rialb option which we believe means the purchase of the Rialb stock itself. We agree with the respondent that the purported purchase of the Rialb option on November 9, 1951, by issuing a check of Independent Oil for $43,000 to the Rosenbaum firm, and by the accounting to Young for the alleged disbursements of $43,000 on the same date in his behalf was a sham and a device which was resorted to in order to create the appearance of a sale of a capital asset in a tax avoidance plan to convert the income from the commissions into long-term capital gain. It is concluded that the Rosenbaum firm in August 1950 was *386 a party to an arrangement whereby it was to receive fees or commissions from Price, and that it was intended that Young was to receive a share of such commissions. It has not been proved that insofar as Price's purchase of steel was concerned the Rosenbaum firm or Young rendered any services. However, the funds making up the payments of Price were not gifts. It is held that they constituted ordinary income. The respondent has determined that there was a joint venture in which the petitioner and the Rosenbaum firm were the parties, each having an equal interest. Under that determination the respondent has treated the share of each party in the commissions as $50,000. We do not have the Rosenbaum firm before us; only Young is the taxpayer involved in this case. He deposited with the firm $500, but he did not contribute that amount to a joint venture. No payment of money was required or made by petitioner or the Rosenbaum firm in order to obtain the payments made by Price. The respondent's determination is in error in holding the petitioner taxable in each of the taxable years for more than he actually received, and in failing to make an adjustment for the return to him of his $500. It *387 is our belief that there was both an intention and an understanding that petitioner would receive a substantial part of what was paid by Price as commissions, but it does not necessarily follow that there was a joint venture within the meaning of section 182. The share of the commissions which petitioner received was ordinary income in the year received. The question for decision is the correctness of the determination that the petitioner received ordinary income in each taxable year and not the soundness of the reasons for the determination given in the deficiency notice. Raoul H. Fleischmann, 40 B.T.A. 672, 681. Petitioner reports income on the cash basis. There should be included in his income for each year the amount he actually received. In 1950, a withdrawal was made of $3,000 for Otis Young. Petitioner testified that he was responsible for that advance to Otis. None of the withdrawals from Atlantic Basin were loans. Therefore the total amount paid to petitioner in 1950 was $29,000. The respondent included in petitioner's income for 1950 $27,500. He has not made a claim for any deficiency increase on the ground that petitioner's share of the commissions received *388 in 1950 was more than he determined originally. Therefore our finding that Young received commissions in the amount of $29,000 will not result in an increased deficiency for 1950. In 1951 the petitioner received commissions in the net amount of $13,500, after allowing for return to him of $500. In this case controlled corporations, controlled transactions, and transfers of funds to and through controlled corporations were involved in the disputed transactions. Under all of the circumstances it is proper to closely scrutinize the facts. This has been done. The relationships and the circumstances have invited inquiry into whether certain transactions were arm's-length arrangements and bona fide. The respondent did not err in applying the rule that in certain situations, for tax purposes, substance will prevail over form, and the realities of transactions will be regarded as determinative. United States v. Phellis, 257 U.S. 156; Moline Properties, Inc. v. Commissioner, 319 U.S. 436; Minnesota Tea Co. v. Helvering, 302 U.S. 609; Higgins v. Smith, supra; *389 Griffiths v. Helvering, supra; National Investors Corp. v. Hoey, 144 F. 2d 466. See, also, Paul Plunkett & Co., 42 B.T.A. 464; Wilhelmina Dauth, 42 B.T.A. 1181; Campana Corporation, 114 F. 2d 400. Where the issue is whether the transaction under scrutiny is in fact what in form it appears to be, the transaction as a whole must be considered. The form of the transaction may be intended to deceive others. It is the intent which contradicts that which is apparent which controls, not necessarily the intent to reduce taxes. One may so arrange one's affairs as to arrive at as low a tax as the law allows. Bullen v. Wisconsin, 240 U.S. 625. Here the intention was to deceive others. The substance of what was done is controlling, and in substance the petitioner realized ordinary income in each of the taxable years. For the year 1949, the decision will be that there is a deficiency in income tax in the amount of $6,108.10. For the years 1950 and 1951, Rule 50 computations are required. Decision will be entered under *390 Rule 50.