T.C. Memo. 2009-223

UNITED STATES TAX COURT

RODNEY JORDAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2555-00, 12938-01.    Filed September 29, 2009.

Rodney Jordan, pro se.

<u>Rebecca Dance Harris</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, <u>Judge</u>:   By notice of deficiency, respondent determined deficiencies in and penalties on petitioner and Carmen Jordan's Federal income taxes as reported on their joint returns as follows:

|  |  | Penalty |
| --- | --- | --- |
| Year | Deficiency | Sec. 6662(a) |
| 1988 | $24,599 | $4,920 |
| 1991 | 187,288 | 37,458 |

By separate notices of deficiency, respondent determined deficiencies in and penalties on petitioner's Federal income taxes as reported on his and Carmen Jordan's joint tax returns as follows:

|  |  | Penalty |
| --- | --- | --- |
| Year | Deficiency | Sec. 6662(a) |
| 1993 | $8,477 | $1,695 |
| 1994 | 2,019 | 404 |
| 1995 | 52,693 | 10,289 |
| 1996 | 82,320 | 16,464 |

After concessions, the issues remaining for decision are: (1) Whether for taxable years 1991 and 1992 petitioner had unreported income from certain alleged withdrawals or payments from Earth Construction, Inc. (ECI), and its profit-sharing plan; (2) whether for taxable year 1991 petitioner had unreported income from a sale of gravel rights to ECI; (3) whether for taxable year 1993 petitioner had unreported rental income and income from other unidentified sources; (4) whether for taxable year 1994 petitioner had unreported income from discharge of indebtedness; (5) whether for taxable year 1995 petitioner had unreported income from his gravel pit business; (6) whether for taxable year 1995 petitioner is entitled to certain deductions claimed with respect to his gravel pit business; (7) whether for

taxable year 1996 petitioner understated his income on Schedule C, Profit or Loss From Business; (8) whether for taxable years 1993, 1994, and 1995 petitioner had taxable income attributable to payments to Carmen Jordan by her wholly owned S corporation, Green Mountain Custom Crushing, Inc. (GMCC), and from flow-through adjustments to GMCC's income tax returns; (9) whether petitioner's reported losses from horse activities for taxable years 1991 through 1994 are limited by section 469; and (10) whether petitioner is liable for the section 6662 accuracy-related penalty for all years at issue.[1]

When he filed his petition at docket No. 2555-00, petitioner resided in New Hampshire. When he filed his petition at docket No. 12938-01, he resided in Tennessee. The parties have stipulated that any appeal of these consolidated cases will lie with the U.S. Court of Appeals for the Sixth Circuit.

The parties have stipulated some facts, which we incorporate herein by reference. For purposes of order and clarity, we have set forth below separately our Findings of Fact and Opinion for each issue.

The burden of proof is generally upon the taxpayers, except as may be otherwise provided by statute or determined by the

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Court.  See Rule 142(a).[2]  The U.S. Court of Appeals for the Sixth Circuit, to which any appeal of these cases would lie, has held that the Commissioner's determination of unreported income must be based on a "minimal evidentiary foundation" in order for the presumption of correctness to attach.  United States v. Walton, 909 F.2d 915, 919 (6th Cir. 1990).  Once the Commissioner meets his initial burden of production, the taxpayers bear the "burden of producing credible evidence that they did not earn the taxable income attributed to them or of presenting an argument that the IRS deficiency calculations were not grounded on a minimal evidentiary foundation."  Id.; see Olmos v. Commissioner, T.C. Memo. 2007-82.

---

[2]Sec. 7491(a) shifts the burden of proof to the Commissioner in certain circumstances with respect to any factual issue relevant to ascertaining the taxpayer's liability for tax imposed by subtit. A or B of the Code.  See sec. 7491(a)(1); Rule 142(a)(2).  Sec. 7491 is effective with respect to court proceedings arising from examinations commenced after July 22, 1998.  See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(1), 112 Stat. 727.  Similarly, sec. 7491(c) places the burden of production on the Commissioner with respect to the liability of any individual for any penalty, addition to tax, or additional amount, in court proceedings arising in connection with examinations commencing after July 22, 1998.  The parties have stipulated that respondent's audit of the years at issue commenced before July 22, 1998.  Consequently, the provisions of sec. 7491(a) and (c) are inapplicable to these cases.

Issue 1.  Petitioner's Alleged Withdrawals in 1991 and 1992

FINDINGS OF FACT

In 1979 petitioner, Carmen Jordan, and David Shields started Earth Construction, Inc. (ECI).  This company primarily constructed roads and bridges for the State transportation departments of Vermont and New Hampshire.  During periods relevant to these cases, petitioner owned 51 percent of ECI, Carmen Jordan owned 15 percent, and David Shields owned 34 percent.  Petitioner served as ECI's president and director.

A.    Petitioner's Takings From ECI's Profit-Sharing Plan

In 1985 ECI started a profit-sharing plan.  Petitioner, Carmen Jordan, and David Shields were named trustees of the ECI profit-sharing plan.  By 1991, however, petitioner had taken over complete control of the profit-sharing plan and handled its financial affairs.  A.G. Edwards & Sons, Inc. (A.G. Edwards), handled ECI's investments, although petitioner made all decisions.  As of the end of 1992, the plan had about 31 participants.[3]

On July 31, 1991, petitioner withdrew $100,000 from ECI's profit-sharing plan and deposited it into a personal bank account.  On December 27, 1991, petitioner withdrew an additional $48,677 from ECI's profit-sharing plan and deposited it into his

_____

[3]The record does not indicate the number of plan participants on other dates.

personal account. These two withdrawals nearly depleted the profit-sharing plan's assets.

On January 31, 1992, the last day of the profit-sharing plan's fiscal year, ECI wrote a check for $150,000 to the profit-sharing plan's account, effectively replenishing the funds that petitioner had taken.[4] The replenishment, however, was to be short lived. On February 18, 1992, petitioner withdrew $140,000 from the profit-sharing plan and deposited the check into his personal bank account. On February 21, 1992, petitioner wrote a check on this same personal bank account to purchase a cashier's check for $140,000, payable to First Vermont Bank and Trust Co. This cashier's check was deposited in ECI's line of credit account at First Vermont Bank and Trust Co. The proceeds were used to underwrite ECI's purchase of a gravel pit from a company in Tilton, New Hampshire.

On February 28, 1992, petitioner withdrew another $10,000 from the profit-sharing plan and deposited it into his personal account, thereby depleting all but $1,298.45 of the plan's assets.

In 1996 the U.S. Department of Labor brought suit against petitioner for improper takings from ECI's profit-sharing plan. See Metzler v. Jordan, No. 1:96-cv-117 (D. Vt., Apr. 4, 1996).

---

[4]The profit-sharing plan's annual reports are prepared at the end of each plan year for submission to the IRS and issuance to the plan participants.

As a result of this suit, in 1997 a judgment of $238,894.78 was entered against petitioner, representing a principal amount of $150,000 plus interest.[5]

B. Petitioner's Withdrawals on ECI's Line of Credit

On August 1, 1991, petitioner withdrew $330,000 on ECI's line of credit at First Vermont Bank & Trust Co. He deposited the funds in his personal bank account.[6] The same day, he used these funds, plus some of the funds he had withdrawn from ECI's profit-sharing plan, to purchase seven convenience stores operating under the name of H-OUR Mart, Inc. (H-OUR Mart), in which he owned a 50-percent interest.[7]

C. Suit Brought by David Shields

On February 23, 1992, David Shields filed a complaint in the Superior Court of Caledonia County, Vermont, against petitioner, Carmen Jordan, and ECI. He alleged, among other things, that

---

[5]The record does not conclusively identify which of petitioner's withdrawals made up the $150,000 principal amount. The record also does not reflect whether petitioner has paid this judgment.

[6]The parties have stipulated that petitioner withdrew $300,000. Facts disclosed by the record clearly show, however, that the actual amount of the withdrawal was $330,000 and that the income adjustment in the notice of deficiency is predicated upon this figure, which petitioner does not dispute. Consequently, we disregard the stipulation insofar as it indicates that the amount of the withdrawal was $300,000 rather than $330,000. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

[7]The other 50-percent owner was Gilles W. Desjarlais; the record does not reveal the amount, if any, of his investment.

petitioner had improperly caused $150,000 to be withdrawn from ECI's profit-sharing plan and had diverted about $500,000 of ECI's working capital to purchase an interest in H-OUR Mart. By summary order dated December 20, 1994, the Caledonia superior court entered a judgment of $200,000 in favor of David Shields.[8]

## D. Bankruptcy Proceedings

On May 3, 1993, petitioner and Carmen Jordan filed for chapter 11 bankruptcy. On January 5, 1994, petitioner and Carmen Jordan's second amended plan under chapter 11 was confirmed by the bankruptcy court.

On November 25, 1997, Carmen Jordan filed for chapter 13 bankruptcy. On March 31, 1998, her chapter 13 plan was confirmed by the bankruptcy court.

## E. Tax Returns and Notice of Deficiency

Respondent determined that in 1991 petitioner received $478,677 of unreported taxable wages from ECI. Although the notice of deficiency does not detail the manner in which this number was derived, the parties appear to agree that it represents the sum of the $100,000 that petitioner withdrew from ECI's profit-sharing plan on July 31, 1991, the additional $48,677 that petitioner withdrew from ECI's profit-sharing plan on December 27, 1991, and the $330,000 that petitioner drew

---

[8]The damages were apparently calculated taking into account that David Shields owned a 34-percent interest in ECI.

against ECI's line of credit on August 1, 1991, and invested in H-OUR Mart. In the same notice of deficiency respondent determined that in 1992 petitioner received $246,279 of unreported taxable wages from ECI. Again, the notice of deficiency does not detail the manner in which this number was derived, but the parties appear to agree that it represents the sum of $150,000 that petitioner allegedly withdrew from ECI's profit-sharing plan in February 1992 and an additional $96,279 of otherwise unidentified payments that ECI made to petitioner in 1992.

## OPINION

Petitioner does not dispute that he received funds totaling at least $478,677 in 1991 and $246,279 in 1992. He contends, however, that these receipts represent loans from ECI pursuant to an open account rather than taxable income and that he actually repaid greater amounts to ECI than he received in 1991 and 1992.[9]

---

[9]Because no deficiency has been determined for 1992, we lack jurisdiction with respect to that year. See sec. 6214(b); Paccon, Inc. v. Commissioner, 45 T.C. 392, 396-397 (1966); Parker v. Commissioner, 37 T.C. 331, 332 (1961). We may, however, determine the correct amount of taxable income or NOL for a year not in issue (whether or not the assessment for that year is time barred) as a preliminary step in determining the correct amount of an NOL carryback or carryover to a taxable year in issue. See sec. 6214(b); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 274-275 (1990). The notice of deficiency for 1988 and 1991 states that "the elimination of the 1992 NOL affects the tax years 1989 and 1990" by increasing petitioner's taxable income for those years. Similarly, the notices of deficiency for the later years disallow amounts characterized as

(continued...)

1.  Petitioner's 1991 Withdrawals

Plainly, the funds that petitioner misappropriated from ECI's profit-sharing plan cannot be said to be loans from either ECI or the plan.[10]

Similarly, the record does not show that the $330,000 that petitioner withdrew on ECI's corporate line of credit was properly authorized.  The court judgment awarding damages to ECI's former vice president, David Shields, for petitioner's unlawful diversion of ECI's working capital to H-OUR Mart, suggests strongly otherwise.  Petitioner testified that he

---

[9](...continued)
"carryback/carryover" without explanation of the year of origination.  Petitioner appears to assign as error the disallowance of at least some of these "carryback/carryforwards" on the ground that they are properly allowable carryforwards of a 1992 NOL.  Both parties have addressed respondent's adjustments to petitioner and Carmen Jordan's 1992 taxable income, from which we infer that the parties agree that these adjustments are properly at issue in these cases as affecting the proper amount of carryback and carryforward of any 1992 NOL carryover.  We expect the parties to address this matter in the Rule 155 computations.

[10]Petitioner suggests vaguely that some of the money he withdrew from the profit-sharing plan represented his and Carmen Jordan's own contributions.  Even if we were to assume for the sake of argument that petitioner and Carmen Jordan made contributions to the profit-sharing plan, this would not mean that the withdrawals were necessarily nontaxable.  A profit-sharing plan is a type of deferred compensation plan.  See sec. 1.401-1(b)(1)(ii), Income Tax Regs.  Distributions are generally taxable under rules relating to annuities.  Subject to various exceptions, distributions from a profit-sharing plan are generally taxable.  See sec. 402(a).  Petitioner has not established the applicability of any exception to this general rule.

discussed the $330,000 withdrawal with ECI's accountant who "set it up as a loan".  In support of this testimony petitioner points to ECI's financial statements, which show, as of December 31, 1991, a $500,694 loan receivable from H-OUR Mart, which amount presumably includes the $330,000 in question.  The record, however, contains no documentation of any loan agreement between ECI and H-OUR Mart.  To the contrary, the record strongly suggests that petitioner diverted the $330,000 from ECI to finance his 50-percent ownership interest in H-OUR Mart.  In the light of these circumstances, we attach little significance to the manner in which ECI's accountant, after the fact and in collaboration with petitioner, might have chosen to set up the transaction.

Petitioner contends that he should not be taxable on any of the 1991 receipts in question because he repaid ECI even more than he received.  In support of this contention petitioner relies upon his own testimony and numerous photocopied documents, including receipts, personal checks, and portions of ECI's books and records.

We are not persuaded that petitioner repaid any part of the $148,677 he took from ECI's profit-sharing plan in 1991 or the $330,000 he withdrew from ECI's corporate line of credit.  In the first instance, according to petitioner's own contentions, the $148,677 that he took from the profit-sharing plan was not repaid

until January 31, 1992, when he orchestrated ECI's payment of $150,000 into the plan. Similarly, according to petitioner's own contentions, the $330,000 that he withdrew from ECI's corporate line of credit is reflected in a $500,694 loan receivable from H-OUR Mart, as shown on ECI's yearend 1991 financial statements.[11] Because the $330,000 ostensibly remained in this balance as of yearend 1991, the financial statements do not support a conclusion that petitioner repaid this amount in 1991.

That said, the record does support petitioner's contention that in 1991 he and Carmen Jordan made certain payments to or on behalf of ECI. On the basis of all the evidence in the record we are not convinced, however, that these payments represent repayments of the withdrawals in question. By way of example, the record shows that in the fall of 1991 Carmen Jordan, on petitioner's behalf, wrote two checks to ECI totaling $190,000.[12]

---

[11]As previously discussed, we do not view the manner in which ECI reported these amounts on its financial statements as dispositive. We refer to the financial statements here only to evaluate petitioner's claims to have repaid these amounts.

[12]In particular, the record contains copies of these canceled checks: A $175,000 personal check dated Oct. 31, 1991, and a $15,000 personal check dated Nov. 12, 1991. Both of these checks are signed by Carmen Jordan and drawn on her and petitioner's joint bank account and posted as credits in the "Accounts Receivable-Officers" account in ECI's general ledger. In her request for innocent spouse relief submitted to the Commissioner on Feb. 23, 2000, Carmen Jordan stated that in the fall of 1991 petitioner asked her to lend him $175,000 so that he could repay a portion of debt that he owed ECI and that several weeks later he sought to borrow an additional $15,000 from her.

(continued...)

These repayments are reflected as credits in ECI's general ledger under "Accounts Receivable-Officers", as are certain other amounts that petitioner claims to have paid ECI. This general ledger account, however, does not reflect the line-of-credit and profit-sharing plan withdrawals that are at issue; consequently, the various credits to the account do not support a conclusion that repayments were made with respect to the withdrawals at issue. More fundamentally, the "Accounts Receivable-Officers" general ledger account shows that in 1991 debits to the account exceeded credits by about $83,000, suggesting that petitioner and Carmen Jordan made withdrawals from ECI in addition to the withdrawals that respondent has determined to be taxable income, and that those additional withdrawals exceeded the amount of any repayments that were made in 1991.[13] Consequently, after careful review of the evidence, we are not persuaded that any of the payments that petitioner and Carmen Jordan allege to have made to

---

[12](...continued)
According to her statement, she issued the checks to ECI as petitioner had requested but later successfully sued him to recover these funds.

[13]This conclusion is bolstered by the notes to ECI's financial statements which, under the heading "Related Party Transactions", show a similar increase from yearend 1990 to yearend 1991 in "Loans receivable from stockholder" from $74,262 to $161,584.

ECI in 1991 are properly regarded as repayments of the withdrawals at issue.[14]

Petitioner also claims that various other amounts should be counted as repayments of the withdrawals at issue for 1991. This amount includes $100,000 of income that he acknowledges realizing from his sale of gravel rights to ECI during 1991. Petitioner suggests that the $100,000 should be netted against the withdrawals in question for 1991 because he received the $100,000 amount not in cash but as a "set-off" to his "running balance" with ECI. Petitioner's contention is without merit. As discussed infra, the sale of gravel rights resulted in $100,000 of taxable income to petitioner in 1991. Accordingly, it in no way reduces the taxable income petitioner realized from his withdrawals from ECI's profit-sharing plan and ECI's corporate line of credit. Nor do we find any support in the record for petitioner's suggestion that the $100,000 is double-counted in respondent's determination.

---

[14]In the light of this conclusion, it is unnecessary to describe in detail the extensive evidence that petitioner has offered to show payments made to ECI in 1991, other than to say that we find it to be of variable quality and persuasiveness. While some of the evidence suggests additional payments were made to ECI in 1991 and recorded in ECI's books, most of the evidence relates to purported payments that are not reflected in the portions of ECI's books and records that petitioner has introduced into evidence. Petitioner has offered no convincing explanation why ECI's books and records reflect only certain of the payments he alleges he made.

In sum, we sustain respondent's determination that in 1991 petitioner had unreported taxable income of $478,677 from the transactions in question.[15]

2. Petitioner's 1992 Profit-Sharing-Plan Withdrawals

On January 31, 1992, ECI wrote a check for $150,000 to the profit-sharing plan's account; on February 18, 1992, petitioner withdrew $140,000 from the profit-sharing plan and deposited it into his personal bank account at Bradford National Bank; and on February 21, 1992, petitioner wrote a check on this same personal bank account to purchase a cashier's check for $140,000, payable to First Vermont Bank and Trust Co., to be deposited in ECI's corporate line of credit and used to underwrite ECI's purchase of a gravel pit. In substance, then, petitioner orchestrated the transfer of $140,000 over the course of about 20 days from ECI to the profit-sharing plan to himself to ECI's corporate line of credit. The end result was that petitioner effectively restored for ECI's benefit $140,000 of the funds that he had caused to be placed temporarily in the profit-sharing plan. Then, on February 28, 1992, petitioner withdrew another $10,000 from the profit-sharing plan and deposited it into his personal account.

---

[15]Respondent has characterized this unreported income as "wages" from ECI. Although it seems to us that these withdrawals might more accurately be characterized as wrongful conversions, the labeling does not affect the taxation of these amounts as ordinary income to petitioner.

For reasons not entirely clear to us, both in the notice of deficiency and on brief respondent has characterized petitioner's withdrawals from ECI's profit-sharing plan as "wages". If we were to agree with respondent's characterization, we might conclude that in 1992 petitioner voluntarily repaid $140,000 of the $150,000 "wages" and consequently had taxable income of $10,000. See Young v. Commissioner, T.C. Memo. 1961-33. Alternatively, and perhaps more plausibly, viewing the withdrawals as wrongful conversions, we similarly conclude that in 1991 petitioner made restitution of $140,000, leaving $10,000 of taxable income. See Fox v. Commissioner, 61 T.C. 704, 712-714 (1974); Chumbrook v. Commissioner, T.C. Memo. 1977-108.

### 3. Other Payments From ECI to Petitioner in 1992

In the notice of deficiency issued to petitioner and Carmen Jordan for taxable years 1988 and 1991 respondent determined that petitioner's 1992 unreported taxable income included, in addition to $150,000 of withdrawals from ECI's profit-sharing plan, $96,279 of payments from ECI. The notice of deficiency provides no explanation for this determination. Nor has respondent offered any evidence or separate argument about this $96,279 item. Rather, on brief respondent seems inexplicably to lump together this amount and petitioner's withdrawals from ECI's profit-sharing plan. Nevertheless, petitioner does not deny receiving the $96,279 of payments from ECI in 1992. He contends,

however, that these payments simply reflect a "running balance" between himself and ECI and that the payments are approximately equal to amounts that he paid in 1992 to ECI or on ECI's behalf. In support of this contention petitioner introduced into evidence copies of many checks written on his personal bank account to various parties, including ECI, and gave detailed testimony about these payments.

Bearing heavily against respondent, who has offered no reasoned explanation for the basis on which he determined that the $96,279 was taxable income and has offered no evidence in this regard, we accept petitioner's explanation as adequately supported by the evidence. We do not sustain respondent's determination in this regard.[16]

Issue 2. Petitioner's Sale of Gravel Rights to ECI

FINDINGS OF FACT

In 1991 petitioner sold gravel rights to ECI for $100,000. The proceeds were not reported on petitioner and Carmen Jordan's joint 1991 Federal income tax return.

---

[16]In reaching this result we are mindful that petitioner produced similar evidence and gave similar testimony as to amounts he alleges to have paid on ECI's behalf in 1991. In that instance, however, as previously discussed, we have concluded that the taxable income was from sources other than from any "running balance".

OPINION

Petitioner does not dispute that in 1991 he sold gravel rights to ECI for $100,000 but contends that this income is not taxable because the proceeds were not paid to him in cash but instead "came in the form of a setoff or credit expressed in the running balance of transactions between Petitioner and ECI." We disagree.

In the first instance, in contradiction of petitioner's argument, ECI's cashflow statement for the year ended December 31, 1991, shows a cash outflow of $100,000 for "Purchase of mineral rights", described in more detail in notes to the financial statements as "Purchase of rights to 100,000 yards of material located in a gravel pit owned by the Company president". But even if we were to assume, for the sake of argument, that rather than pay $100,000 directly to petitioner, ECI applied this amount to satisfy debts owed by petitioner, the result would be the same--for income tax purposes the transaction would be equivalent to petitioner's selling the gravel rights to ECI for $100,000 cash and then using the cash to defray his alleged debt to ECI. See Frazier v. Commissioner, 111 T.C. 243, 245 (1998); Schultz v. Commissioner, 59 T.C. 559, 565 (1973); Bialock v. Commissioner, 35 T.C. 649, 660 (1961).

Regardless of whether petitioner received the $100,000 of proceeds in cash or in satisfaction of claims against him, his

taxable gain is the amount by which $100,000 exceeds his adjusted basis in the gravel rights.  See sec. 1001(a); Bialock v. Commissioner, supra at 660.  The record does not establish the amount, if any, of petitioner's adjusted basis in the gravel rights.  Accordingly, we sustain respondent's determination that in 1991 petitioner realized taxable income of $100,000 on his sale of the gravel rights.

Issue 3.  Petitioner's Alleged Unreported Income in 1993

FINDINGS OF FACT

Respondent determined that in 1993 petitioner had unreported rental income of $3,483 from Jay Peak, Inc.  Respondent also determined that in 1993 petitioner realized $43,986 of unreported capital losses attributable to transactions in a brokerage account.  Respondent determined that petitioner therefore had $43,986 of ordinary income because, as stated in the notice of deficiency, "the Jordans would have to cover the $43,986 in losses with deposits to the account."

OPINION

A.  Unreported Rental Income

The parties have stipulated as follows:  "In 1993, the petitioner received taxable income from Jay Peak, reported to the petitioner on a Form 1099-MISC, in the amount of $10,973.00, of which the petitioner reported only $7,490.00 on his 1993 income tax return."  Notwithstanding this stipulation, on reply brief

petitioner contends that he correctly reported $7,490 as the amount of net rental income, after deducting "internal charges for house keeping, etc." He also contends that respondent has not met his "minimum burden of evidence as to this issue." We reject these contentions as contrary to the parties' stipulation and unsupported by any competent evidence.

B.   Imputed Income

Respondent has determined that because petitioner had an unreported capital loss of $43,986, he must have had unreported income of the same amount to cover the loss. Viewed charitably, this determination borders on the whimsical. Setting aside questions as to why petitioner's tax liability should reflect only this conjectural income and not the actual losses upon which it is improbably predicated, suffice it to say that respondent has introduced no evidence to show that petitioner actually covered the unreported losses, much less with unreported income. This determination is not sustained.

Issue 4.  Discharge of Indebtedness Income--1994

FINDINGS OF FACT

Respondent determined that in 1994 petitioner had $5,005 of unreported income from discharge of debt.

OPINION

The parties have stipulated as follows:  "In 1994, the petitioner received taxable discharge of indebtedness income from

Chase Manhattan Bank, reported to the petitioner on a Form 1099-C, in the amount of $5,005.00, which the petitioner did not report on an income tax return." Notwithstanding this stipulation, on reply brief petitioner contends that the $5,005 is not taxable because "the discharge was part of the bankruptcy proceedings". We reject this contention as contrary to the stipulation and unsupported by competent evidence.

Issue 5. Petitioner's Unreported Schedule C Income--1995

FINDINGS OF FACT

On Schedule C of their joint 1995 Federal income tax return, petitioner and Carmen Jordan reported $7,974 of gross receipts or sales from petitioner's gravel pit business. Respondent determined that this amount was understated by $55,935, on the ground that petitioner had $63,909 of unexplained deposits. As explained in the notice of deficiency, this amount reflects $21,355 that petitioner deposited in the fall of 1995 into his account at A.G. Edwards and $42,554 that petitioner deposited at some unspecified time into his personal account at First New Hampshire Bank.

OPINION

In the absence of adequate recordkeeping by a taxpayer as mandated by section 6001, the Commissioner is authorized to reconstruct the taxpayer's income by any reasonable method that clearly reflects income. See, e.g., sec. 446(b); Holland v.

United States, 348 U.S. 121, 130-132 (1954).  One acceptable method is the bank deposits method.  Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, 96 T.C. 858, 867 (1991), affd. 959 F.2d 16 (2d Cir. 1992); Bevan v. Commissioner, T.C. Memo. 1971-312, affd. 472 F.2d 1381 (6th Cir. 1973).  The bank deposits method assumes that if a taxpayer is engaged in an income-producing activity and makes deposits to bank accounts, then those deposits, less amounts identified as nonincome items, constitute taxable income.  See Clayton v. Commissioner, supra at 645-646.  Where the Commissioner has used the bank deposits method to determine deficiencies, the taxpayer bears the burden of showing that the determinations are incorrect.  See DiLeo v. Commissioner, supra at 871; Bevan v. Commissioner, supra.

Petitioner does not dispute making the deposits in question. He contends, however, that his deposits into his A.G. Edwards account merely represent transfers from other of his accounts. The evidence shows that the subject deposits in the A.G. Edwards account include three interaccount transfers totaling $5,200 that did not represent items of gross receipts in 1995.  We conclude that these items should be omitted from respondent's income reconstruction.[17]  Petitioner has failed, however, to establish

---

[17]Petitioner also contends that two other deposits of $500 and $800 similarly represent interaccount transfers, but the evidence in the record is insufficient to substantiate these claims.

that any of the other amounts deposited into his A.G. Edwards accounts represent items other than gross receipts. Accordingly, we hold and conclude that $16,155 of the deposits to petitioner's A.G. Edwards account in 1995 represents taxable income.

Acknowledging that in 1995 he deposited more than $42,554 into his personal account at First New Hampshire Bank, petitioner has attempted to show that these deposits were from nontaxable sources. The evidence in the record does not substantiate these claims. By way of example, petitioner claims that $20,121 of his First New Hampshire Bank deposits in 1995 represents insurance proceeds relating to a theft loss incurred at H-OUR Mart. Petitioner suggests that these insurance proceeds are nontaxable because they represent "repayment from my basis". Petitioner has produced no documentation either of an insurance claim for a theft loss or of payment on any such claim by an insurance company; moreover, petitioner has not explained why insurance proceeds relating to a theft loss incurred by H-OUR Mart should be paid to petitioner directly or, if they were, why the proceeds would represent nontaxable return of basis. Similarly, although petitioner has offered detailed explanations of the other deposits into his First New Hampshire Bank, the evidence in the record does not convince us that these deposits were from nontaxable sources.

Issue 6.  Schedule C Deductions--1995

FINDINGS OF FACT

On his and Carmen Jordan's joint 1995 Federal income tax return petitioner claimed various Schedule C deductions including a $10,000 "Crushing Cost" which respondent disallowed.[18] On Form 886A, Explanation of Items, respondent's examining agent explained this adjustment as follows:

> An amount of $10,000 was deducted on the Schedule C of Rodney Jordan.  This amount was purportedly in payment of crushing costs to Green Mountain Custom Crushing. Numerous checks are written to and from Rodney, Carmen and Green Mountain Crushing.  Rodney Jordan has not provided all bank statements for all accounts, has not provided invoices, and has not provided all cancelled checks.  Rodney Jordan claims to have paid expenses of Green Mountain Custom Crushing in exchange for crushing.  A listing of amounts totaling $12236 was not examined in detail.  Rodney Jordan has also been paid amounts from Green Mountain Custom Crushing that he considers to be reimbursements.

> Examination of the returns has revealed additional income and it is impossible to determine at this time if expenses are for Green Mountain or in relation to the unreported income or to the existing schedule C.

OPINION

Petitioner has the burden of proving he is entitled to the claimed deduction.  See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933).  At trial petitioner offered no evidence that he was

---

[18]Petitioner also claimed as a Schedule C expense $9,999 of interest expense.  During respondent's examination of petitioner's 1995 tax return, respondent's allowance of an additional $68 in interest expenses and disallowance of the crushing costs of $10,000 for 1995 resulted in a $9,932 net adjustment to petitioner's Schedule C deductions.

entitled to deduct crushing costs.  Instead, petitioner contends that during the audit he submitted to respondent's examining agent documentation to substantiate even more than the $10,000 deduction claimed on his Schedule C but she refused in bad faith to consider the documentation.  In support of this contention, petitioner focuses on the above-quoted language from the Form 886A:  "A listing of amounts totaling $12236 was not examined in detail."

Because a trial before the Tax Court is a de novo proceeding, "our determination of a petitioner's tax liability must be based on the merits of the case and not any previous record developed at the administrative level."  Jackson v. Commissioner, 73 T.C. 394, 400 (1979) (citing Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 328 (1974)).  Having offered no competent evidence in support of this claimed deduction, petitioner has failed to establish that he is entitled to the claimed deduction for crushing costs.  In any event, the Form 886A suggests that respondent's examining agent declined to examine petitioner's "listing of amounts" in detail partly because it was impossible to tell whether GMCC had reimbursed petitioner for the amounts he was claiming as deductions.  We take into account this same consideration in concluding that petitioner has failed to establish entitlement to the claimed

deduction.  Respondent's determination as to this issue is sustained.

Issue 7.  Unreported Schedule C Income--1996

### FINDINGS OF FACT

On Schedule C to their 1996 joint Federal income tax return, petitioner and Carmen Jordan reported $9,945 gross income from a "Gravel Pit/Logging Operation".  On the basis of a bank deposits analysis, respondent determined that this Schedule C income was understated by $228,519.  In particular, respondent determined that in 1996 these bank deposits, totaling $238,464, represented taxable income of:  (1) $85,417.82 deposited into petitioner's personal accounts at Merchants Bank; (2) $61,276 deposited into the bank account of Sodalitan Mayer, a woman with whom petitioner was then living; and (3) $91,740 deposited into petitioner's account at A.G. Edwards.

### OPINION

The issue is whether respondent correctly determined that in 1996 petitioner and Carmen Jordan understated Schedule C income by $228,519.[19]

---

[19]On reply brief petitioner contends that after trial respondent conceded all but $92,774 of this amount and that on brief respondent has improperly failed to abide by this alleged concession.  The record does not reflect any such concession.

A.    The Merchants Bank Deposits

Petitioner has stipulated that in 1996 he received $82,764.92 from "various Schedule C sources" which he deposited into his Merchants Bank accounts but did not report on an income tax return.  He has also stipulated that in 1996 he received $2,652.90 of Schedule C income from a lumber company which he did not report on an income tax return; the notice of deficiency reflects this item as an additional deposit into one of petitioner's Merchants Bank accounts.  Petitioner has failed to show that respondent erred in treating these Merchants Bank deposits as taxable income.  We conclude that $85,417.82 of petitioner's 1996 deposits to his Merchants Bank accounts represent taxable income to him.

B.    Deposits to Sodalitan Mayer's Account

The parties have stipulated that in 1996 checks payable to petitioner and totaling $57,760.55 were deposited into Sodalitan Mayer's account.  Petitioner has offered neither argument nor evidence to show that respondent erred in determining that these $57,760.55 of deposits represent taxable income to him.  This $57,760.55 amount as to which the parties have stipulated is $3,515.90 less than the $61,276.45 described in the notice of deficiency as having been deposited into Sodalitan Mayer's account.  The notice of deficiency indicates that this remaining $3,515.90 of alleged deposits was transferred by petitioner from

another of his bank accounts.  On the basis of all the evidence, we conclude that this interaccount transfer does not represent an item of gross receipts in 1996.  We conclude and hold that petitioner is taxable on $57,760.55 of the deposits he made into Sodalitan Mayer's account.

C.    Deposits to Petitioner's A.G. Edwards Account

Petitioner has stipulated that in 1996 checks made payable to him and totaling $91,740 were deposited into his A.G. Edwards account.  The evidence of record persuades us that two of the underlying deposits, one for $5,000 and another for $6,500, represent petitioner's interaccount transfers rather than unreported income.  Petitioner has failed, however, to show that respondent erred in treating the other $80,240 of deposits into his A.G. Edwards account as taxable income.[20]  We conclude that $80,240 of the deposits to petitioner's A.G. Edwards account represents taxable income.

---

[20]Petitioner alleges that $44,000 of these deposits was generated by a payment from a "wealthy entrepreneur" in consideration of an option to purchase a one-half interest in a gravel pit that petitioner owned.  Petitioner contends that this option expired in 1998, at which time he declared the amount "as a capital gain on my 1998 income taxes".  Petitioner has provided no documentary evidence to support these contentions and has offered no explanation for failing to do so.  We draw an adverse inference from these lapses, see Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1164 (1946), affd. 162 F.2d 513 (10th Cir. 1947), and find petitioner's testimony insufficient to establish that the deposits did not represent taxable income as respondent charged, see Sharwell v. Commissioner, 419 F.2d 1057, 1060 (6th Cir. 1969), vacating and remanding on other issues T.C. Memo. 1968-89.

Issue 8.  Items Pertaining to Carmen Jordan and GMCC

In 1990 Carmen Jordan incorporated her wholly owned S corporation, GMCC.[21]  Some of the deficiencies in dispute arise in part from respondent's determinations that Carmen Jordan had unreported income from GMCC or from flow-through adjustments to GMCC.  As a threshold matter, petitioner contends that these issues are "void" because Carmen Jordan's debts were discharged in bankruptcy.  His brief states:  "It is common knowledge that the IRS failed to file proof of claim and therefore their debt was discharged in the confirmed bankruptcy plan(s)."  The record does not establish whether any of Carmen Jordan's tax liabilities were discharged in bankruptcy.  But whether they were discharged or not is irrelevant to the determination of petitioner's tax liability.  Spouses who file joint returns are jointly and severally liable for the entire tax liability, which may be collected from either spouse.  See sec. 6013(d)(3).  Carmen Jordan's bankruptcy case has no effect on petitioner's liability under section 6013(d)(3).

A.  Carmen Jordan's 1993 and 1994 Payments From GMCC

FINDINGS OF FACT

During 1993 and 1994 GMCC was in financial straits.  It had little cash and no available sources of outside credit.  In an

---

[21]For the periods at issue, GMCC's taxable years ended Dec. 31.

effort to keep the company going Carmen Jordan advanced funds to GMCC from time to time as necessary to allow it to pay its bills. These advances were in the form of numerous checks or cash deposits, of varying, relatively small amounts, totaling $29,575 in 1993 and $16,205 in 1994. From time to time, as it had funds available, GMCC would make payments to Carmen Jordan of varying, relatively small amounts. These payments from GMCC to Carmen Jordan totaled $29,295 in 1993 and $37,595 in 1994.

On their 1993 joint Federal income tax return petitioner and Carmen Jordan reported $8,218 of wages which, according to an attached Form W-2, Wage and Tax Statement, all represented wages to petitioner from GMCC. On their 1994 joint return petitioner and Carmen Jordan reported $13,200 of wages, which according to an attached Form W-2, all represented wages to Carmen Jordan from GMCC. Respondent determined that Carmen Jordan had unreported wages of $29,295 in 1993 and $24,395 in 1994 (representing total wages of $37,595 less the $13,200 reported on the return).

## OPINION

Although the notice of deficiency is not explicit in this regard, the parties appear to agree that the determination relates to unreported wages allegedly paid to Carmen Jordan by GMCC. Petitioner does not expressly deny that in 1993 and 1994 Carmen Jordan received payments from GMCC as determined in the

notice of deficiency.[22]  Petitioner contends, however, that Carmen Jordan paid into GMCC more than it paid out to her during these years, and that the payments at issue represent nontaxable "loan repayments" on open account.

Petitioner has introduced into evidence numerous canceled checks and deposit tickets showing that, as we have found, Carmen Jordan made payments or cash deposits to GMCC totaling $29,575 in 1993 and $16,205 in 1994.[23]  These canceled checks and bank deposit tickets generally indicate that the amounts paid are a "temp loan" or a "cash loan".  In one instance, a canceled check for $8,000 in October of 1993 indicates that it is for a "loan payback".

---

[22]Petitioner has introduced into evidence copies of canceled checks showing payments from GMCC to Carmen Jordan during 1993 and 1994.  The amounts of GMCC's payments evidenced by these canceled checks are less than the payments determined in the notice of deficiency.  We are not convinced, however, that the canceled checks in evidence represent the totality of all checks issued by GMCC to Carmen Jordan in 1993 and 1994.  In any event, as mentioned in the text supra, petitioner has not expressly disputed that GMCC paid Carmen Jordan the amounts indicated in the notice of deficiency.

[23]Petitioner also suggests that we should take into account payments and deposits that Carmen Jordan allegedly made to GMCC in 1995 and 1996, which he contends greatly exceeded payments to her from GMCC during those years and resulted in a greater "surplus" in Carmen Jordan's favor.  Because the determinations at issue involve only 1993 and 1994, we limit our analysis to those years.

Respondent does not expressly dispute that in 1993 and 1994 Carmen Jordan made substantial payments to GMCC.[24] Respondent suggests, however, that those payments should be disregarded because petitioner has produced no "loan documentation" to show any loans between Carmen Jordan and GMCC.

Particularly in a circumstance like this involving transactions between a corporation and its sole shareholder on an open account, formal indicia of indebtedness are not necessarily essential to the existence of bona fide debt; rather, the question is whether there is a bona fide expectation of repayment. "Advances are an additional contribution of capital if they are intended to enlarge the stock investment, but not if they are intended as a loan." Edward Katzinger Co. v. Commissioner, 44 B.T.A. 533, 536 (1941) (open-account cash advances by taxpayer to wholly owned corporation constituted loans), affd. 129 F.2d 74 (7th Cir. 1942); cf. Am. Processing and Sales Co. v. United States, 178 Ct. Cl. 353, 371 F.2d 842, 851–857 (1967) (corporation's advances to its subsidiary, taking the form of non-interest-bearing open accounts and made with a reasonable expectation of repayment, were loans); Byerlite Corp.

---

[24]Counting only the amounts indicated on the canceled checks and disregarding the amounts shown on the deposit tickets, respondent contends that Carmen Jordan's deposits into GMCC were less than the amounts indicated supra. Respondent has offered no explanation for disregarding cash deposits as indicated on the deposit tickets.

v. Williams, 286 F.2d 285, 290-291 (6th Cir. 1960) (advances on open account by a parent corporation to its subsidiary were loans).

Indeed, the regulations contemplate that such open-account transactions between a shareholder and an S corporation may constitute indebtedness. The regulations provide that "shareholder advances not evidenced by separate written instruments and repayments on the advances (open account debt) are treated as a single indebtedness."[25] Sec. 1.1367-2(a), Income Tax Regs. The basis of a shareholder's open account debt is properly determined by netting shareholder advances and repayments that occur during the S corporation's tax year. Brooks v. Commissioner, T.C. Memo. 2005-204; cf. Cornelius v. Commissioner, 494 F.2d 465 (5th Cir. 1974) (advances and repayments that constitute separate transactions are not properly netted), affg. 58 T.C. 417 (1972). As a corollary, a shareholder has gain on repayments of open account debt during a year only to the extent that the repayments exceed advances during the year plus the basis of the debt as of the beginning of the year.

On the basis of all the evidence, we are convinced that Carmen Jordan intended that GMCC would repay the advances at issue and that GMCC intended to repay and did in fact repay them.

---

[25]The regulations have been modified with respect to shareholder advances made to an S corporation on or after Oct. 20, 2008. See T.D. 9428, 2008-2 C.B. 1174.

We conclude that the advances are properly treated as open account debt rather than as separate transactions.

In 1993 Carmen Jordan's advances to GMCC of $29,575 exceeded by $280 the $29,295 of payments that GMCC made to her, leaving her a basis of $280 in the open account debt. Consequently, in 1993 GMCC's payments to Carmen Jordan gave rise to no taxable income to her.

In 1994 the $37,595 of payments that GMCC made to Carmen Jordan exceeded by $21,110 the sum of Carmen Jordan's $16,205 of advances to GMCC and her $280 carryover basis in the open account debt. We conclude that this $21,110 of net repayments represents ordinary income to her in 1994.[26] We conclude that petitioner and Carmen Jordan's joint 1994 return underreported ordinary income by $7,910 ($21,110 less the $13,200 reported on the joint return as wages).

B. <u>Disallowed Losses From GMCC--1993, 1994, and 1995</u>

FINDINGS OF FACT

On their joint Federal income tax returns, petitioner and Carmen Jordan reported losses from GMCC of $62,369 for 1993, $62,409 for 1994, and $46,599 for 1995.

---

[26]Petitioner does not expressly dispute respondent's characterization of the payments as ordinary income. To the contrary, on their joint 1994 Federal income tax return, petitioner and Carmen Jordan characterized $13,200 of the payments from GMCC to Carmen Jordan as ordinary wage income.

Respondent determined that as of yearend 1992 Carmen Jordan's adjusted basis in her GMCC stock was $33,754. Respondent determined that Carmen Jordan's 1993 GMMC loss was limited to this amount of adjusted basis and accordingly disallowed $28,885 ($62,639 minus $33,754) of the claimed 1993 loss. Determining that this partial allowance of the 1993 loss eliminated any remaining basis in Carmen Jordan's GMCC stock, respondent disallowed in its entirety the claimed 1994 loss of $62,409.

In addition, respondent disallowed the claimed 1995 loss, determining on the basis of flow-through adjustments to GMCC's 1995 income tax return, that in 1995 Carmen Jordan actually had ordinary income from GMCC of $92,189, resulting in an adjustment of $138,788 ($92,189 plus the $46,599 disallowed loss). The notice of deficiency indicates that these flow-through adjustments resulted from adjustments to expense accounts.

OPINION

1. The 1993 and 1994 Losses

Generally, an S corporation shareholder determines his or her tax liability by taking into account a pro rata share of the S corporation's income, losses, deductions, and credits. Sec. 1366(a)(1). The shareholder may not take into account, however, S corporation losses and deductions for any taxable year in

excess of the shareholder's adjusted basis in the S corporation's stock and debt.  Sec. 1366(d)(1).[27]

Petitioner bears the burden of establishing Carmen Jordan's basis in her GMCC stock.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Petitioner has failed to establish that Carmen Jordan's basis in GMCC as of yearend 1992 was any greater than determined in the notice of deficiency.[28]  We sustain

---

[27]More exactly, with respect to taxation of a shareholder of an S corporation, sec. 1366(a)(1) provides:

> there shall be taken into account the shareholder's pro rata share of the corporation's--
>
>> (A) items of income (including tax-exempt income), loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder, and
>>
>> (B) nonseparately computed income or loss.

The aggregate amount of losses and deductions taken into account by such shareholder for a taxable year cannot exceed the sum of:  "(A) the adjusted basis of the shareholder's stock in the S corporation * * *, and (B) the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder".  Sec. 1366(d)(1).

[28]Petitioner contends that Carmen Jordan's adjusted basis in GMCC should be increased by $60,000 to reflect equipment purchases she made in 1990 and 1991.  The evidence introduced in support of this claim indicates that GMCC, not Carmen Jordan, was the purchaser of the equipment.  Although Carmen Jordan testified that the equipment was purchased with her cash, no documentation was offered into evidence to corroborate this claim.  In any event, the record does not establish that Carmen Jordan's adjusted basis in GMCC as of yearend 1992 as determined by respondent does not include any equipment purchases Carmen Jordan might have made on behalf of GMCC in 1990 or 1991.

respondent's determination disallowing the claimed GMCC losses for 1993 and 1994 in excess of that basis.[29]

## 2. Unreported 1995 GMCC Income

Petitioner contends that the notice of deficiency issued to him with respect to the flow-through adjustments resulting from respondent's examination of GMCC's 1995 income tax return "failed to adequately notify Petitioner of the specifics in which to defend".  He alleges:  "The IRS has failed to notify Petitioner of the examination results, which would have been essential for Petitioner to know in order to prepare and appropriately defend the IRS position."[30]  As to this issue, petitioner suggests that respondent should have the burden of proof, contending that respondent "failed to establish the minimum burden pursuant to this issue."

Insofar as petitioner's contentions may be construed as attacking the validity of the notice of deficiency in this regard, they must fail.  Section 7522(a) provides that a notice of deficiency "shall describe the basis for, and identify the

---

[29]Respondent concedes that these disallowed losses from 1993 and 1994 will be available to offset a portion of Carmen Jordan's unreported GMCC income for 1995, as discussed infra.

[30]At trial respondent's counsel asserted that petitioner was not entitled to challenge the adjustments of GMCC's 1995 tax return, suggesting that only GMCC or Carmen Jordan would be entitled to challenge the adjustment.  Respondent has not pursued this argument on brief; we deem respondent to have conceded or waived it.

amounts (if any) of, the tax due, interest, additional amounts, additions to the tax, and assessable penalties included in such notice." The statute goes on to provide, however, that an "inadequate description * * * shall not invalidate such notice." The purpose of section 7522 is to give the taxpayer notice of the Commissioner's basis for determining a deficiency. See Shea v. Commissioner, 112 T.C. 183, 196 (1999). The notice of deficiency apprised petitioner in at least general terms of the basis for respondent's determination and identified the amount of tax due as a result of the flow-through adjustments from GMCC.

Insofar as petitioner's contentions may be construed as seeking to shift the burden of proof to respondent, they must also fail. The U.S. Court of Appeals for the Sixth Circuit has held that the Commissioner cannot rely on the presumption of correctness to support a determination of unreported income "'in the absence of a minimal evidentiary foundation'". United States v. Walton, 909 F.2d at 919 (quoting Weimerskirch v. Commissioner, 596 F.2d 358, 361 (9th Cir. 1979), revg. 67 T.C. 672 (1977)). By contrast, it is well established that the taxpayer bears the burden of proof with regard to claimed losses or other deductions. See, e.g., Time Ins. Co. v. Commissioner, 86 T.C.

298, 313-314 (1986); <u>Chaum v. Commissioner</u>, 69 T.C. 156, 163-164 (1977).[31]

We do not believe that the holding of <u>Walton</u> has any applicability to the determination in question, which ultimately is predicated on respondent's disallowance of expenses claimed by GMCC. But even if we were to assume, for sake of argument, that the item in issue is properly regarded as stemming from alleged unreported income, we believe that the requisite minimal evidentiary foundation has been established. In <u>Weimerskirch v. Commissioner</u>, <u>supra</u>, upon which <u>Walton</u> is predicated, there was no evidence connecting the taxpayer with the activity allegedly producing the unreported income. By contrast, in the instant cases there is no question as to the relationship of Carmen Jordan to the income-producing activity of GMCC. Because petitioner is jointly and severally liable for the taxes resulting from the GMCC flow-through adjustments, Carmen Jordan's

---

[31]As the Court of Appeals stated in <u>United States v. Walton</u>, 909 F.2d 915, 918 (6th Cir. 1990) (quoting Moraski, Note, "Proving A Negative--When the Taxpayer Denies Receipt", 70 Cornell L. Rev. 141, 141 (1984)): "When, for example, the IRS bases an assessment on the disallowance of deductions, 'placing the burden of proof on the taxpayer is reasonable because the taxpayer has better access to evidence of the underlying transactions.'" There would appear to be some tension between this observation and subsequent dicta in <u>Walton</u> suggesting that the Court of Appeals might also require the Government to provide a "minimal evidentiary foundation" where the issue in dispute is the taxpayer's "payment of expenses". <u>Id.</u> at 919. For the reasons explained in the text <u>supra</u>, we need not attempt today to resolve any such tension.

connection with GMCC's income-producing activity provides a minimal evidentiary foundation, if any be required, to support respondent's deficiency determination against petitioner.

Petitioner complains that respondent failed to notify him adequately of the specific adjustments to GMCC's return. He does not expressly dispute, however, that respondent communicated with Carmen Jordan about the GMCC adjustments in her capacity as GMCC's sole shareholder. In fact, according to Carmen Jordan's testimony, she previously petitioned this Court to challenge the flow-through adjustments of GMCC.[32] Testifying as petitioner's witness, she expressed familiarity with issues underlying the flow-through adjustments in question. We are not persuaded that petitioner lacked access to, or through discovery could not have obtained, information about the GMCC adjustments as necessary to defend against them.

In fact, on brief, having complained about lack of access to the specifics of the GMCC adjustments, petitioner identifies "With conjecture" the makeup of the disputed S corporation adjustments to within $77.18 of the $138,788 total adjustments at issue. Although petitioner makes various assertions as to why he believes these adjustments were in error, he has failed to

---

[32]We take judicial notice that on Feb. 10, 2000, Carmen Jordan petitioned this Court and that on June 23, 2000, this Court granted respondent's unopposed motion to dismiss the case on the ground that the petition was filed in violation of the 11 U.S.C. sec. 362(a)(8) automatic bankruptcy stay.

support these contentions with competent evidence.  Petitioner
has failed to carry his burden of proving that respondent erred
in this determination.

Issue 9.  Passive Losses From Horse Activities

FINDINGS OF FACT

In 1990 Alice Stockwell wrote petitioner a letter inquiring
whether he was interested in investing in a business of breeding
and raising Morgan horses.  She represented that she had the
knowledge, experience, time, and facilities but lacked the
financial resources.

In 1991 Alice Stockwell, Chet Stockwell, Phillip Pierce, and
petitioner formed Chalice Farms, Inc. (Chalice Farms), for the
purpose of breeding and raising Morgan horses.[33]  The business
started with just a couple of horses that Alice Stockwell already
had on her property.  Petitioner provided funds to buy another
three horses.  In the winter of 1991 petitioner helped finance
the construction of an addition to a barn on Alice Stockwell's
property for the horse operations.  Before that, beginning in
September 1991 and continuing for 4 or 5 months, petitioner kept
three or four of the Chalice Farms horses at his own property,

---

[33]Chalice Farms, Inc., was registered with the secretary of
state of Vermont as a corporation.  Nevertheless, the parties
have stipulated that "for purposes of this case, the petitioner
and Alice Stockwell will be considered partners in the reporting
of the income and loss from Chalice Farms, Inc. for the taxable
years 1991, 1992, 1993 and 1994".

which was distant from Alice Stockwell's property.  Alice Stockwell testified that she initially visited the horses only intermittently, but finding them poorly cared for, eventually ended up going every day to take care of them.

In 1992 petitioner and Alice Stockwell began to have problems jointly operating Chalice Farms.  In June 1993 petitioner filed a complaint in State court seeking the liquidation of the assets of Chalice Farms and demanding an accounting of all income and expenses.  In her answer Alice Stockwell denied that petitioner had been involved in the breeding, raising, training, and sale of horses for Chalice Farms.  In her counterclaim she sought damages, alleging that in consideration of her agreeing to work full time on the breeding, raising, training, and sale of horses, petitioner had agreed to pay her a weekly salary and to provide working capital to run the business but had failed to do so.  In an order dated February 24, 1995, the Vermont Superior Court ordered petitioner to pay $5,700 to Alice Stockwell, representing $300 per month for her past care of the horses from July 1993 and also to pay her $300 per month for the continuing care and feeding of the horses.  In 1995 Chalice Farms was dissolved.

On his and Carmen Jordan's joint Federal income tax returns, petitioner claimed these losses from Chalice Farms:

| Year | Loss |
|------|------|
| 1991 | $28,816 |
| 1992 | 30,475 |
| 1993 | 9,726 |
| 1994 | 5,076 |

Respondent disallowed these claimed losses as being attributable to a passive activity.

OPINION

Section 469(a) limits the deductibility of losses from certain passive activities of individual taxpayers. Passive losses disallowed in one year generally may be carried over to the next year. See sec. 469(b). Generally, a passive activity is a trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1). Material participation is defined generally as regular, continuous, and substantial involvement in the business operations. Sec. 469(h)(1). The regulations identify these seven situations in which an individual will be treated as materially participating in an activity:

(1) The individual participates in the activity for more than 500 hours during such year;

(2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;

(3) The individual participates in the activity for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

(4) The activity is a significant participation activity (within the meaning of paragraph (c) of this section) for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours;

(5) The individual materially participated in the activity (determined without regard to this paragraph (a)(5)) for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year;

(6) The activity is a personal service activity (within the meaning of paragraph (d) of this section), and the individual materially participated in the activity for any three taxable years (whether or not consecutive) preceding the taxable year; or

(7) Based on all of the facts and circumstances (taking into account the rules in paragraph (b) of this section), the individual participates in the activity on a regular, continuous, and substantial basis during such year.

[Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).]

The regulations also provide that the last-described "facts and circumstances" test requires that the individual's participation in the activity exceed 100 hours during the taxable year. Sec. 1.469-5T(b)(2)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

Although the regulations permit a taxpayer to establish the extent of his participation by "any reasonable means", sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), a postevent "ballpark guesstimate" does not suffice, see Lee v. Commissioner, T.C. Memo. 2006-193; Bailey v. Commissioner, T.C. Memo. 2001-296; Carlstedt v. Commissioner,

T.C. Memo. 1997-331; <u>Speer v. Commissioner</u>, T.C. Memo. 1996-323; <u>Goshorn v. Commissioner</u>, T.C. Memo. 1993-578.

Petitioner has not provided us even a ballpark estimate of the number of hours he allegedly spent in his Chalice Farm activities. Nor does the record otherwise establish the number of hours petitioner might have spent in those activities. Consequently, he has not established that he meets the quantitative requirements of the first, third, fourth, or seventh test described above. The record does not provide any basis for concluding that he meets the requirements of any of the other seven tests for material participation. On the basis of all the evidence, we conclude and hold that petitioner has failed to establish that he materially participated in the Chalice Farms activity.[34] Respondent's determination is sustained.

<u>Issue 10. Accuracy-Related Penalty</u>

Respondent has determined that the section 6662(a) accuracy-related penalty applies against petitioner for each of the years in issue. Section 6662(a) authorizes the Commissioner to impose a penalty in an amount equal to 20 percent of the portion of the underpayments that are attributable to the items set forth in section 6662(b). Section 6662(b)(1) includes any underpayment

_____

[34]On brief petitioner contends that as a consequence of the dissolution of Chalice Farms in 1994 he is entitled to "carry back the unused portion of his $173,300 contributions" in Chalice Farms. Petitioner has failed to establish the existence or amount of any such loss.

attributable to negligence or disregard of rules or regulations. Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]". Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (negligence is lack of due care or failure to do what a reasonable and prudent person would do under the circumstances). Negligence also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly. See sec. 1.6662-3(b)(1), Income Tax Regs.

No penalty shall be imposed under section 6662(a) with respect to any portion of an underpayment if it is shown that there was reasonable cause and that the taxpayer acted in good faith. See sec. 6664(c). Whether a taxpayer acted in good faith depends upon the facts and circumstances of each case. See sec. 1.6664-4(b)(1), Income Tax Regs. Reliance on a professional return preparer may be reasonable and in good faith if the taxpayer establishes: (1) The return preparer had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the return preparer; and (3) the taxpayer actually relied in good faith on the return preparer's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Petitioner suggests that he is not liable for the negligence penalty because he properly relied in good faith on his tax return preparer. Petitioner has not, however, pursued this defense in any meaningful way. Apart from passing references in his testimony to his tax return preparer, the record is devoid of evidence to support petitioner's contentions. Petitioner did not call his tax return preparer as a witness. There is no evidence in the record as to the advice his tax return preparer might have given him; no evidence to support a determination that petitioner acted reasonably or in good faith in relying upon it; no evidence as to his tax return preparer's qualifications; no evidence that petitioner disclosed to his tax return preparer all relevant facts and circumstances; and no evidence that the advice was based on reasonable factual or legal assumptions.

Petitioner also contends that he was not negligent as to any of the items pertaining to Carmen Jordan or GMCC because "he had no personal knowledge in which to be negligent." Because petitioner made joint returns with Carmen Jordan, his liability for penalties is joint and several. See sec. 6013(d)(3); Pesch v. Commissioner, 78 T.C. 100, 129 (1982). Petitioner has introduced no evidence to show that the underpayments arising from items pertaining to Carmen Jordan or GMCC were not the result of negligence or that he and Carmen Jordan acted with

reasonable cause and in good faith in reporting these items on their joint returns.

We conclude that petitioner's underpayments are attributable to negligence or disregard of rules or regulations. We hold that petitioner is liable for accuracy-related penalties under section 6662(a) based on the amount of his underpayments for the years at issue, to be determined in the Rule 155 computations.

To reflect the foregoing and the parties' concessions,

Decisions will be entered

under Rule 155.